1    [JOINT FILING — SEE SIGNATURE PAGE FOR LIST OF COUNSEL]

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                        NORTHERN DISTRICT OF CALIFORNIA

10                                OAKLAND DIVISION

11   |                                        )    No. 4:10-cv-4947-CW (filed Nov. 2, 2010)
     | eBay Inc. and Microsoft Corporation,   )
12   |                                        )    **DEFENDANTS' CLAIM CONSTRUCTION**
     |      *Plaintiffs and Counterclaim-Defendants,* )  **BRIEF AND MOTION FOR SUMMARY**
13   |                                        )    **JUDGMENT OF INVALIDITY AND NON-**
     |      vs.                               )    **INFRINGEMENT**
14   |                                        )
     | Kelora Systems, LLC,                   )    Hr'g Date:    Thursday, Nov. 17, 2011
15   |                                        )    Hr'g Time:    2:00 p.m.
     |      *Defendant and Counterclaim-Plaintiff.* )  Place:        Courtroom 2, 4th Floor
16   |                                        )
     |                                        )    No. 4:11-cv-1398-CW (filed Mar. 23, 2011)
17   | Cabela's Inc.,                         )    (related case)
     |                                        )
18   |      *Plaintiff and Counterclaim-Defendant,* )
     |                                        )
19   |      vs.                               )
     |                                        )
20   | Kelora Systems, LLC,                   )
     |                                        )
21   |      *Defendant and Counterclaim-Plaintiff.* )
     |                                        )
22

23

24

25

26

27

28

| | | |
|---|---|---|
| 1 | Kelora Systems, LLC, | No. 4:11-cv-1548-CW (filed Nov. 8, 2010) (related case) |
| 2 | Plaintiff and Counterclaim-Defendant, | |
| 3 | vs. | |
| 4 | Target Corporation; OfficeMax Incorporated; | |
| 5 | Rockler Companies, Inc.; 1-800-Flowers.com, Inc.; Amazon.com, Inc.; Dell, Inc.; Office | |
| 6 | Depot, Inc.; Newegg Inc.; Costco Wholesale Corporation; Hewlett-Packard Company; | |

Kelora Systems, LLC,

    *Plaintiff and Counterclaim-Defendant,*

    vs.

Target Corporation; OfficeMax Incorporated; Rockler Companies, Inc.; 1-800-Flowers.com, Inc.; Amazon.com, Inc.; Dell, Inc.; Office Depot, Inc.; Newegg Inc.; Costco Wholesale Corporation; Hewlett-Packard Company; CircuitCity.com Inc.; Audible, Inc.; and Zappos.com, Inc.,

    *Defendants and Counterclaim-Plaintiffs.*

OfficeMax Incorporated,

    *Third-Party Plaintiff,*

    vs.

Adobe Systems Incorporated,

    *Third-Party Defendant.*

No. 4:11-cv-1548-CW (filed Nov. 8, 2010)
(related case)

Nebraska Furniture Mart, Inc.,

    *Plaintiff and Counterclaim-Defendant,*

    vs.

Kelora Systems, LLC,

    *Defendant and Counterclaim-Plaintiff.*

No. 4:11-cv-2284-CW (filed Feb. 3, 2011)
(related case)

## NOTICE

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:  Please take notice that eBay Inc.; Microsoft Corporation; Cabela's Inc.; Target Corporation; OfficeMax Incorporated; Rockler Companies, Inc.; 1-800-Flowers.com, Inc.; Amazon.com, Inc.; Dell, Inc.; Office Depot, Inc.; Newegg Inc.; Costco Wholesale Corporation; Hewlett-Packard Company; CircuitCity.com Inc.; Audible, Inc.; Zappos.com, Inc.; and Nebraska Furniture Mart, Inc. (collectively, "Defendants") hereby move for summary judgment that amended claims 1–4 and 9 of the patent-in-suit (U.S. Patent No. 6,275,821) are invalid and/or not infringed.  Judge Wilken is presently scheduled to hear this motion at 2:00 p.m. on November 17, 2011, in Courtroom 2 on the 4th Floor of the U.S. District Court at 1301 Clay Street, Oakland, California 94612.  *See* Exs. 33, 35.

This motion is based on the following, all of which are being submitted today, September 15, 2011:

i.   the Memorandum of Points and Authorities below;

ii.  the attached Exhibits 1 to 42 ("Ex.");

iii. the declaration of Marc R. Ascolese and attached Exhibits 1 to 53 (Feb. 24, 2011) ("Ascolese Decl."), which summarizes the previous litigation involving the '821 patent-in-suit;

iv.  the declaration of Nick Arnett and attached Exhibits A to C (Sept. 12, 2011) ("Arnett Decl."), which corroborates that persons of ordinary skill knew in 1994 that web servers were "stateless";

v.   the declaration of Theodore W. Chandler and attached Exhibits Q to S (May 28, 2009) ("Chandler Decl."), which includes a copy of the AMP Navigator software that this Court found to be § 102(b) prior art to the '821 patent-in-suit;

vi.  the declaration of Daniel Leventhal and attached Exhibits 1 to 24 (Sept. 15, 2011) ("Leventhal Decl."), which includes additional prior art to the '821 patent-in-suit;

vii. in Case Nos. 11-1398, 11-1548, and 11-2284 only, the confidential declaration of Ray R. Larson and attached Exhibits A to D (Sept. 15, 2011) ("Larson Decl."), which concerns facts specific to the Endeca Users (Nebraska Furniture Mart, Cabela's, and Newegg);

viii. the prosecution history of U.S. Patent No. 5,715,444 ("'444 Prosecution"), the grandparent to the patent-in-suit;

ix.  the prosecution history of U.S. Patent No. 6,275,821 ("'821 Prosecution"), the patent-in-suit; and

1         x.    the prosecution history of the reexamination of U.S. Patent No. 6,275,821 ("'821
2              Reexam").

3
## RELIEF REQUESTED

4
By this motion, Defendants seek summary judgment that amended claims 1–4 and 9 of the

5  '821 patent are invalid and/or not infringed.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
Nos. 10-4947-CW, 11-1398-CW, 11-1548-CW, 11-2284-CW

## <u>TABLE OF CONTENTS</u>

I.    INTRODUCTION .................................................................................................. 1

II.   ISSUES TO BE DECIDED .................................................................................. 2

III.  FACTS ................................................................................................................. 3

      A.    The patent-in-suit:  U.S. Patent No. 6,275,821 to Danish and Kimbrough ................. 3

      B.    Screenshots from the inventors' "AMP Navigator" program, which this Court
            determined both practices the original claims of the '821 patent and is prior art
            to the '821 patent ................................................................................................. 3

      C.    The first embodiment described in the '821 patent is a "local" embodiment,
            similar to the AMP Navigator, where all steps are performed on a *standalone*
            computer .............................................................................................................. 8

      D.    The second embodiment described in the '821 patent is a client/server
            embodiment where the "client" computer performs some steps and the
            "server" computer performs other steps .............................................................. 9

      E.    Overview of the previous case involving the '821 patent filed by PartsRiver in
            2007 with help from Danish ................................................................................. 10

      F.    eBay and Microsoft's motion in Case No. 09-811 for summary judgment of
            non-infringement and invalidity of original claims 1 and 2, which was granted
            with respect to invalidity under § 102(b) due to the on-sale bar .............................. 11

      G.    Amendments made to claims 1 and 9 of the '821 patent during reexamination
            to try to circumvent the "divided infringement" problems identified in Case
            No. 09-811 ............................................................................................................ 11

      H.    Overview of the present actions involving Kelora, a new entity created by
            Danish for the purpose of enforcing the '821 patent ........................................... 14

IV.   LEGAL STANDARDS ......................................................................................... 15

      A.    Claim construction .............................................................................................. 15

      B.    Obviousness under 35 U.S.C. § 103 .................................................................... 15

      C.    Summary judgment ............................................................................................. 16

V.    ARGUMENT ....................................................................................................... 16

      A.    Claims 1–4 and 9 are obvious in light of the Court's prior summary judgment
            ruling and known Internet and Web techniques ................................................... 16

            1.    Claims 1, 2, and 9 are obvious ................................................................. 17

                  a.    Overview ........................................................................................ 17

                  b.    Kelora is bound by the prior on-sale bar ruling ................................. 17

-v-

c.     Client-server databases, the World Wide Web, and
resubmission of search terms were all well known ........................... 19

i.     Client-server arrangements, including the World Wide
Web were well known ........................................................... 20

ii.    Resubmission was known *and* preferred in the World
Wide Web environment ......................................................... 22

d.     It would have been obvious to modify AMP Navigator to
include all the elements of amended claims 1, 2, and 9 ..................... 24

i.     AMP Navigator in combination with known client-
server and World Wide Web art includes all elements
of amended claims 1, 2, and 9 ................................................ 25

ii.    The prior art provides explicit motivation to combine .......... 25

iii.   The general knowledge of those in the art provides
additional motivation to combine ........................................... 26

e.     Giving due weight to all *Graham* factors, summary judgment is
appropriate ............................................................................ 28

2.     Dependent claim 3 is also obvious ................................................... 29

3.     Dependent claim 4 is also obvious ................................................... 33

B.     Invalidity under 35 U.S.C. § 305: claims 1–4 and 9, as amended during
reexamination, are impermissibly broader than any original claim ........................... 34

1.     Legal standards for § 305 ........................................................... 35

2.     "revising *said data* for said feature screen to indicate the available
alternatives of the [first/second] subfamily": claim 9 ......................... 36

3.     "accepting a second selection criteria" and "selection criteria": claims
1–4 and 9 ............................................................................. 39

C.     Non-infringement: claims 1–4 and 9 requires steps that are not performed by
Defendants' websites ......................................................................... 45

1.     Legal standards for divided infringement .......................................... 45

2.     "displaying": claims 1–4 and 9 .................................................... 46

3.     "revising said feature screen to indicate the available alternatives of
the [first/second] subfamily": claims 1–4 ....................................... 49

4.     "resubmission to the server" / "resubmission by said client computer":
claims 1–4, 9 ........................................................................ 50

D.     Non-infringement:  claims 1, 2, 4, and 9 require steps that are not performed
by Nebraska Furniture Mart, Cabela's, and Newegg ........................................... 51

1.     "determining the available alternatives" ......................................... 52

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
Nos. 10-4947-CW, 11-1398-CW, 11-1548-CW, 11-2284-CW

2. "providing a computer readable data file of stored information"/"reading said data file"............................................................. 53

3. "accepting a second selection criteria" ................................ 54

4. "determining a [first/second] subfamily"............................. 54

E. Claim construction:  the preamble does *not* limit claims 1–4 and 9 to *only* a web server ................................................................................. 55

F. Claim construction for remaining terms ..................................... 57

1. "said alternatives represented in the family" ...................... 57

2. Terms whose construction was previously agreed-upon ..................... 58

a. "family of items"................................................. 58

b. "subfamily of items"............................................ 59

c. "alternative for each item".................................... 59

d. "feature screen"................................................... 59

e. "determining a [first/second] subfamily"................... 59

f. "determining available alternatives"......................... 60

g. "grouping"............................................................. 60

h. "features visually related to respective alternatives" .......... 60

VI. CONCLUSION................................................................................ 60

# TABLE OF AUTHORITIES

## Cases

*Akamai Techs., Inc. v.MIT*,
    No. 2009-1372, 419 Fed. Appx. 989 (Fed. Cir. Apr. 20, 2011) (en banc) ........................... 45

*Anderson v. Int'l Eng'g & Mfg., Inc.*,
    160 F.3d 1345 (Fed. Cir. 1998).................................................................................... 35

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ................................................................................................... 16

*BMC Res., Inc. v. Paymentech, L.P.*,
    498 F.3d 1373 (Fed. Cir. 2007).................................................................... 45, 46, 51, 52

*Boston Scientific Corp. v. Johnson & Johnson*,
    No. 02-790, 2006 WL 6221554 (N.D. Cal. Sept. 19, 2006) (Illston, J.)............................. 43

*Dann v. Johnston*,
    425 U.S. 219 (1976) ................................................................................................... 16

*Dippin' Dots, Inc. v. Mosey*,
    476 F.3d 1337 (Fed. Cir. 2007).................................................................................... 16

*Dow Jones & Co. v. Ablaise Ltd.*,
    606 F.3d 1338 (Fed. Cir. 2010).................................................................................... 25

*Dynacore Holdings Corp. v. U.S. Philips Corp.*,
    363 F.3d 1263 (Fed. Cir. 2004).................................................................................... 46

*Fuji Photo Film Co. v. ITC*,
    386 F.3d 1095 (Fed. Cir. 2004).................................................................................... 44

*Global Patent Holdings, LLC v. Panthers BRHC LLC*,
    586 F. Supp. 2d 1331 (S.D. Fla. 2008), *aff'd*,
    318 Fed. Appx. 908 (Fed. Cir. Apr. 1, 2009) (per curiam)................................................ 46

*Graham v. John Deere Co.*,
    383 U.S. 1 (1966) ......................................................................................... 15, 28, 29

*Hartley v. Mentor Corp.*,
    869 F.2d 1469 (Fed. Cir. 1989).................................................................................... 18

*In re Freeman*,
    30 F.3d 1459 (Fed. Cir. 1994)........................................................................ 34, 35, 36, 39

*Int'l Nutrition Co. v. Horphag Research, Ltd.*,
    220 F.3d 1325 (Fed. Cir. 2000).................................................................................... 18

*Keithley v. The Homestore.com, Inc.*,
    636 F. Supp. 2d 978 (N.D. Cal. 2008) (Illston, J.).......................................................... 45

*KSR Int'l Co. v. Teleflex Inc.*,
    550 U.S. 398 (2007)............................................................................................. passim

*Kyocera Wireless Corp. v. ITC,*
    545 F.3d 1340 (Fed. Cir. 2008)................................................................24

*Mahurkar v. C.R. Bard, Inc.,*
    79 F.3d 1572 (Fed. Cir. 1996)................................................................20

*McKesson Techs. Inc. v. Epic Sys. Corp.,*
    No. 2010-1291, 2011 WL 2173401 (Fed. Cir. May 26, 2011) (en banc)............45

*Merck & Co. v. Teva Pharms. USA, Inc.,*
    395 F.3d 1364 (Fed. Cir. 2005)................................................................48

*Muniauction, Inc. v. Thomson Corp.,*
    532 F.3d 1318 (Fed. Cir. 2008), *cert. denied,* 129 S. Ct. 1585 (2009)..................passim

*Nat'l Steel Car, Ltd. v. Canadian Pac. Ry., Ltd.,*
    357 F.3d 1319 (Fed. Cir. 2004)................................................................26

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.,*
    521 F.3d 1351 (Fed. Cir. 2008)................................................................57

*PA Advisors, LLC v. Google, Inc.,*
    706 F. Supp. 2d 739 (E.D. Tex. 2010) (Rader, C.J.) ..................................45

*Papyrus Tech. Corp. v. N.Y. Stock Exch., LLC,*
    653 F. Supp. 2d 402 (S.D.N.Y. 2009), *aff'd,*
    396 Fed. Appx. 702 (Fed. Cir. Oct. 7, 2010), *cert. denied,* 131 S. Ct. 1518 (2011).............24

*Phillips v. AWH Corp.,*
    415 F.3d 1303 (Fed. Cir. 2005) (en banc)............................................15, 37, 56

*Procter & Gamble Co. v. Teva Pharmaceuticals USA, Inc.,*
    566 F.3d 989 (Fed. Cir. 2009)................................................................19

*Quantum Corp. v. Rodime, PLC,*
    65 F.3d 1577 (Fed. Cir. 1995)................................................................1, 35

*Sharper Image Corp. v. Neotec, Inc.,*
    373 F. Supp. 2d 993 (N.D. Cal. 2005) (Wilken, J.), *appeal dismissed,*
    171 Fed. Appx. 844 (Fed. Cir. Mar. 14, 2006) ......................................1, 35

*Sinorgchem Co. v. ITC,*
    511 F.3d 1132 (Fed. Cir. 2007)................................................................44

*South Corp. v. United States,*
    690 F.2d 1368 (Fed. Cir. 1982) (en banc)..................................................18

*St. Clair Intellectual Prop. Consultants, Inc. v. Canon Inc.,*
    412 Fed. Appx. 270 (Fed. Cir. Jan. 10, 2011)............................................44

*Thermalloy, Inc., v. Aavid Eng'g, Inc.,*
    121 F.3d 691 (Fed. Cir. 1997)................................................................35

*Tokai Corp. v. Easton Enters. Inc.,*
    632 F.3d 1358 (Fed. Cir. 2011)................................................................29

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
Nos. 10-4947-CW, 11-1398-CW, 11-1548-CW, 11-2284-CW

*Trevino v. Gates,*
    99 F.3d 911 (9th Cir. 1996) ............................................................... 19

*V-Formation, Inc. v. Benetton Group SpA,*
    401 F.3d 1307 (Fed. Cir. 2005) ......................................................... 43

*W. Union Co. v. MoneyGram Payment Sys., Inc.,*
    626 F.3d 1361 (Fed. Cir. 2010) ........................................................ 24

*Westwood Chem., Inc. v. United States,*
    525 F.2d 1367 (Ct. Cl. 1975) ............................................................ 18

## **Statutes**

35 U.S.C. § 102(a) ........................................................................................ 24

35 U.S.C. § 102(b) ..................................................................................passim

35 U.S.C. § 102(e) ........................................................................................ 31

35 U.S.C. § 103 ...................................................................................... 15, 16

35 U.S.C. § 112, ¶ 4 ..................................................................................... 46

35 U.S.C. § 261 ............................................................................................ 18

35 U.S.C. § 271(a) ................................................................................. 45, 46

35 U.S.C. § 271(b) ....................................................................................... 46

35 U.S.C. § 271(c) ....................................................................................... 46

35 U.S.C. § 301 ............................................................................................ 12

35 U.S.C. § 302 ............................................................................................ 12

35 U.S.C. § 305 .....................................................................................passim

## **Rules**

Fed. R. Civ. P. 56(a) ................................................................................... 16

## **Other Authorities**

Manual of Patent Examining Procedure (MPEP) § 2258(I)(B) ...................... 12

*Restatement (Second) of Judgments* § 43(1) (1982) .................................... 18

## MEMORANDUM OF POINTS AND AUTHORITIES

**I.      INTRODUCTION**

This motion will finally put an end to a patent that has already been declared invalid by this Court once before.  U.S. Patent No. 6,275,821 concerns an iterative approach to searching for items in a database, where each subsequent search further narrows the results.  In 2009, this Court granted summary judgment of invalidity because it found that prior-art software offered for sale by the named inventors practiced this approach on *standalone* computers.  In response, the patent owner amended claims 1–4 and 9 during reexamination of the '821 patent to limit those claims to (i) a client-server configuration where (ii) the client resubmits to the server *all* of the user's previous search terms (rather than just the user's *most recent* search term).  Neither of these amendments rescues the patent from another finding of invalidity.  First, at the time of the purported invention, storing a database on a central *server* computer so it could be accessed by multiple client computers was a well known alternative to storing a database on a *standalone* computer.  Second, it was well known that Internet servers were "stateless" (meaning that they did not remember previous communications with client computers, but rather treated each client exchange as a new communication).  To perform an iterative search of a database on such a server, therefore, a client necessarily would have to resubmit its previous search terms each time it queried the server.  Indeed, resubmission was not only a known option, it was the *preferred* approach to performing a query on a stateless server.  Accordingly, the claims are obvious and this Court should once again grant summary judgment of invalidity — regardless of what claim constructions are adopted.

Claims 1–4 and 9 of the '821 patent are also invalid for another independent reason:  the amendments to the "revising" and "accepting" steps *broadened* the claims by removing limitations involving the user's computer.  Any claim broadened during reexamination is invalid under 35 U.S.C. § 305 as a matter of law.  *See, e.g.*, *Quantum Corp. v. Rodime, PLC*, 65 F.3d 1577, 1582–84 (Fed. Cir. 1995); *Sharper Image Corp. v. Neotec, Inc.*, 373 F. Supp. 2d 993, 996–98 (N.D. Cal. 2005) (Wilken, J.) (granting summary judgment of invalidity), *appeal dismissed*, 171 Fed. Appx. 844 (Fed. Cir. Mar. 14, 2006).  Kelora's arguments to the contrary depend on erroneous claim constructions for the "revising" and "accepting" steps.

Claims 1–4 and 9 of the '821 patent also cannot be infringed by any of the Defendants because Kelora cannot show that any Defendant performs *all* the steps of the claimed invention.  In particular, the "displaying," "revising," and "resubmission to the server" steps of the claims are all performed by the *client* computer (e.g., the person at home surfing the Web), not Defendants' *servers*.  This "divided infringement" is fatal to Kelora's infringement case.  *See, e.g.*, *Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318, 1328–30 (Fed. Cir. 2008) (finding non-infringement as a matter of law), *cert. denied*, 129 S. Ct. 1585 (2009).  Kelora's arguments to the contrary depend on erroneous claim constructions for the "displaying," "revising," and "resubmission to the server" steps.  Indeed, the construction for "displaying" was *agreed upon* in the previous case to mean "showing on the display device of the user's computer," but now Kelora is taking the remarkable position that "displaying" means "sending" in a transparent attempt to rewrite the claims to avoid the "divided infringement" problem.

With respect to some of the Defendants — Nebraska Furniture Mart, Cabela's, and Newegg — there is an additional, independent "divided infringement" problem:  a *third party* supplies the alleged "computer readable data file of stored information" and performs the alleged "determining" steps.

For any of these independent reasons, summary judgment should be granted and final judgment should be entered.  Although there are additional claim construction disputes between the parties, summary judgment would moot those additional claim construction disputes.  In the event the Court chooses to resolve those additional claim construction disputes, the Court should simply adopt the constructions that were agreed upon in the previous litigation involving the '821 patent.

## II.    **ISSUES TO BE DECIDED**

This motion presents the following issues for the Court to decide:

- Are claims 1–4 and 9 obvious in light of the prior art, including the AMP Navigator program that was the subject of this Court's previous summary judgment of invalidity and known Internet techniques?  (Yes.)

- Are claims 1–4 and 9 invalid under 35 U.S.C. § 305 as a result of the broadening amendments made to the "accepting" step?  (Yes.)

- Is claim 9 invalid under 35 U.S.C. § 305 as a result of the broadening amendment made to the "revising" step?  (Yes.)

-2-

- Are claims 1–4 and 9 not infringed as a result of the divided infringement problem with respect to the "displaying," "revising," and "resubmission to the server" steps? (Yes.)

- Are claims 1–4 and 9 not infringed by Defendants such as Nebraska Furniture Mart who use a third-party vendor that controls the alleged "computer readable data file of stored information" and performs the alleged "determining" steps?  (Yes.)

- If the Court addresses the additional claim construction disputes between the parties, do the preambles limit claims 1 and 9 to the Internet and a client computer running a Mosaic compatible browser?  (No.)

- If the Court addresses the additional claim construction disputes between the parties, does "said alternatives" refer to **all** the alternatives for the family of items?  (Yes.)

- If the Court addresses the additional claim construction disputes between the parties, should this Court adopt the claim constructions that were agreed upon in the last case for the following terms:  "displaying," "family of items"; "subfamily of items"; "alternative for each item"; "feature screen"; "determining a [first/second] subfamily"; "determining available alternatives"; "grouping"?  (Yes.)

## III.   FACTS

### A.   The patent-in-suit:  U.S. Patent No. 6,275,821 to Danish and Kimbrough

The patent-in-suit is U.S. Patent No. 6,275,821 (the "'821 patent").  *See* Exs. 2–3.  The '821 patent is the third in a series of patents that all claim priority from an application filed on October 14, 1994.  *See* Exs. 5, 6.  The named inventors are Sherif Danish and Kris Kimbrough.  *See* Ex. 2.  Both Danish and Kimbrough have a personal interest in all of the present actions involving their patent. *See generally* Ex. 29, at 2:7, :9; Ascolese Decl. Ex. 8.

The '821 patent is entitled "Method and System for Executing a Guided Parametric Search." *See* Ex. 2.  According to the '821 patent, the prior-art methods — including Boolean keyword searching, and hierarchical searching — had various deficiencies.  *See id.* at 1:52–3:33.  The solution claimed by the '821 patent is a "guided search," sometimes called a "parametric search" or a "faceted search."

### B.   Screenshots from the inventors' "AMP Navigator" program, which this Court determined both practices the original claims of the '821 patent and is prior art to the '821 patent

Perhaps the easiest way to understand the concept of a "guided search" is to see it in action. This Court determined in Case No. 09-811 that a program created by Danish and Kimbrough in 1992 called "AMP Navigator" practices the "guided search" method claimed by original claims 1 and 2 of

1   the '821 patent.  *See* Ex. 23 at 5:22–7:2; Ex. 26 at 11:9–:21.  At the same time, this Court determined

2   that the "AMP Navigator" program is prior art to the '821 patent and thus found original claims 1

3   and 2 invalid.  *See* Ex. 26 at 13:10–:14.  Accordingly, the following screenshots from the "AMP

4   Navigator" program illustrate ***both*** the prior art to the '821 patent ***and*** the "guided search" method

5   originally claimed by the '821 patent.  The following screenshots were created using an actual copy

6   of the "AMP Navigator" program and can be reproduced by the Court using any Windows machine.

7   *See* Chandler Decl. ¶ 6;[1] Ex. 23 at 3:12–5:21; Ex. 26 at 13:4–:9.

8          In the first screenshot, a user interested in connectors with a "square flanged receptacle"

9   clicks on the button for "Sq. Flanged Receptacle":



4

21   *See* Ex. 24 at 4.  If the user changes his mind, he can reject (or "undo") the selection of "square

22   flanged receptacles" by clicking on the "Sq. Flanged Receptacle" button a second time.

23          Once the user is satisfied with the selection(s) he has made, he can accept his selection(s),

24   and initiate a search based on his selection(s), by clicking on the "Search" button:

26   _____

[1] The exhibits to this declaration originally were filed under seal on May 28, 2009, *see* Case No.
09-811, ECF Nos. 202–03, but the parties to that case later agreed that nothing in the declaration was
confidential, so the entire declaration (including exhibits) was re-filed as a public document on July
7, 2009, *see id.* ECF Nos. 224, 228–29.

-4-



5

*See* Ex. 24 at 5.

     The third screenshot shows the results of the search:



6

*See* Ex. 24 at 6.  As shown above in the third screenshot, there are 65 part numbers that match the

parameter "Sq. Flanged Receptacle."  The third screenshot also shows that the program greys-out

parameters that can no longer be selected, such as "Solid Feedthrough" and "with Tetraseal."

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
Nos. 10-4947-CW, 11-1398-CW, 11-1548-CW, 11-2284-CW

1      The program allows for iterative searching using the technique.  In the fourth screenshot, the

2  user further refines the search criteria by clicking on the button for "Metal":



7

14  *See* Ex. 24 at 7.

15      Once the user is satisfied with the additional selection(s) he has made, he can accept his

16  selection(s), and initiate a second search based on his selection(s), by clicking on the "Search"

17  button.  As shown in the fifth screenshot, the user accepts his selection of "Metal" and initiates a

18  search for a "square flanged receptacle" *and* a "metal" shell type by clicking on the "Search" button:



*See* Ex. 24 at 8.  The sixth screenshot shows the results of the second search:

*See* Ex. 24 at 9.  As shown above in the sixth screenshot, there are now only 20 part numbers that match **both** parameters "Sq. Flanged Receptacle" **and** "Metal."  Additional parameters that can no longer be selected, such as "Size 16 VDE (Series 1)," are greyed-out.

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
Nos. 10-4947-CW, 11-1398-CW, 11-1548-CW, 11-2284-CW

C.   **The first embodiment described in the '821 patent is a "local" embodiment, similar to the AMP Navigator, where all steps are performed on a *standalone* computer**

The '821 patent describes two embodiments. *See* Ex. 26 at 2:18–:21. The first embodiment, called the "local" embodiment, runs on a ***standalone*** computer, as opposed to a client computer connected to a server computer through a network such as the Internet. *See* Ex. 2 at 7:4–:11. The "local" embodiment described in the '821 patent is almost identical to the prior-art AMP Navigator program shown above. *Compare* Ex. 2 at 7:1–9:9 & figs. 7–9 (first embodiment of the '821 patent), *with* Ex. 24 (screenshots from the prior-art AMP Navigator program).

Figures 7 to 9 of the '821 patent show screenshots from the "local" embodiment described in the patent. *See* Ex. 2. Reprinted below is Figure 8 of the patent, annotated with some of the terms used in the patent and the column and line number in the patent where each term is used:



-8-

**D.** **The second embodiment described in the '821 patent is a client/server embodiment where the "client" computer performs some steps and the "server" computer performs other steps**

The second embodiment described in the '821 patent, called the "Internet embodiment," involves a client computer connected to a server computer through a network such as the Internet. *See* Ex. 2 at 18:10–19:35 & figs. 25–35.  In the local embodiment described above, *all* the steps described in the '821 patent are performed on the local computer; no other computer is involved.  In the Internet embodiment, by way of contrast, some steps of the method are performed by a "server" computer on the network, while other steps are performed on the user's computer (the "client" computer).  Of importance to this motion is that the "displaying," "revising," and "resubmission" steps are performed by the "client" computer, not the "server" computer.  For example, the patent states that "[t]he ***client*** 126 receives the feature screen status 127 and ***displays*** the updated feature screen 9." Ex. 2 at 19:6–:9.[2]

In all other respects, the two embodiments in the patent are nearly identical:  "[T]he Internet embodiment of the electronic catalog application mirrors the user flow in the local embodiment as much as possible." Ex. 2 at 18:32–:34.  Or as this Court put it:  "The local and internet embodiments of the '821 patent share the same underlying concept." Ex. 26 at 12:17–:18.  Both embodiments used conventional hardware and software (a PC computer running Windows).  *Compare* Ex. 2 at 7:4–:10 (local embodiment), *with id.* at 18:10–:32 (Internet embodiment).

Figures 26 to 35 of the '821 patent show screenshots from the Internet embodiment.  *See* Ex. 2.  Reprinted below is Figure 28 of the patent — which shows the "feature screen" in the Internet embodiment — annotated with some of the terms used in the patent and the column and line number in the patent where each term is used.  The patent explains that "the feature screen 9 for the Internet embodiment has a layout that is slightly different from the local embodiment." Ex. 2 at 18:37–:39.

---

[2] Unless stated otherwise, all emphasis in quotes throughout this brief has been added.

**"feature screen" for Internet embodiment (18:62–:63)**



FASTON Receptacles - Uninsulated

_Go to Main Menu_ | _View Family Picture_ | _Reset Selections_ | _View Details_

**Number of Matching P/Ns: 13**   |4   ← **"selection criteria" (18:54)**

[?] _Specials:_ [None] | For Posted Hermetic Tabs | Receptacle/Tab Combination

[?] _Tab Fit:_ .110 x .016 | .110 x .020 | .110 x .025 | .110 x .032 | .187 x .015 | .187 x .017 | .187 x .020 | .187 x .032 | .205 x .020 | .205 x .032 | .250 x .020 | [.250 x .032] | .312 x .032

[?] _Receptacle Style:_ Straight | Flag | Reversible Flag   |4

[?] _Insulation Support:_ Insulation Support | [Non-Insulation Support]

[?] _Wire Type:_ [Regular Wire] | Magnet Wire

[?] _Wire Range:_ 12-10 | 12-10/(2)12/(2)14 | 12-10/(2)14 | 14-10 | 14-10/(2)14 | 16-12 | 16-12/(2)18 | 18-12 | 18-14 | 18-14/(2)16 | 18-14/(2)17 | 18-16 | 18-16/(2)18 | 20-14 | 20-16 | 20-16/(2)20 | 20-16/(2)20/23 | 20-18/(2)20 | 22-16 | 22-18 | 22-20 | 24-19 | 24-20 | 24-22 | 26-22

[?] _Insertion Force:_ [Normal] | Low

[?] _Material:_ Brass | Phosphor-Bronze | Steel

[?] _Finish:_ None | Tin | Pre Tin | Silver | Nickel

[?] _Line:_ Premier | Budget | Economy | Commercial | Moldable

[?] _Crimp Type:_ 'F' | Tab-Lok

8   **"unavailable alternatives" (18:54)**

7   **"available alternatives" (18:53)**

**E.    Overview of the previous case involving the '821 patent filed by PartsRiver in 2007 with help from Danish**

The '821 patent was first asserted in 2007.  The details of that litigation are chronicled in the declaration of Marc Ascolese.  _See_ Ascolese Decl. Ex. A at 3:11–6:23 & Ex. 1 (timeline of events). The following is a summary:  The '821 patent was owned at the time by a company named PartsRiver.  Danish encouraged PartsRiver to assert the '821 patent and was later retained as a consultant for the litigation.  _See_ Ascolese Decl. Exs. 3, 5–8.  PartsRiver filed suit in the Eastern District of Texas and asserted claims 1 and 2 against eBay, Microsoft, and five other companies with shopping websites.  _See id._ Exs. 9, 12.  The defendants immediately filed a motion to transfer the

action to this Court.  *See id.* Ex. 11.  The defendants also filed a request with the Patent Office for an *ex parte* reexamination of the validity of claims 1 and 2 of the '821 patent, *see id.* Ex. 13, which was granted, *see id.* Ex. 14.  Meanwhile, the judge in Texas determined that "the Northern District of California would clearly be a more convenient venue" and transferred the action to this Court.  *See id.* Ex. 17.

### F.    **eBay and Microsoft's motion in Case No. 09-811 for summary judgment of non-infringement and invalidity of original claims 1 and 2, which was granted with respect to invalidity under § 102(b) due to the on-sale bar**

When PartsRiver's action was transferred to this Court, it was assigned Case No. 09-811. The defendants (including eBay and Microsoft) filed a motion for summary judgment of non-infringement and invalidity.  *See* Ex. 23.  The defendants argued that their websites could not infringe claims 1 and 2 because at least the "displaying," "accepting," and "revising" steps were performed on the ***user***'s computers, not the defendants' servers, thus creating a "divided infringement" problem.  *See* Ex. 23 at 1:11–:15, 11:5–:14, 13:4–20:21 (citing *Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318, 1328–30 (Fed. Cir. 2008) (finding non-infringement as a matter of law), *cert. denied*, 129 S. Ct. 1585 (2009)).  The defendants also argued that claims 1 and 2 were invalid under 35 U.S.C. § 102(b) in light of an offer in 1992 to sell the AMP Navigator program discussed above.  *See* Ex. 23 at 5:22–7:14, 20:22–24:24; *see also supra* Part III.B, pp.3–7 (describing the AMP Navigator program).

With respect to non-infringement, this Court agreed with the defendants that "[t]here's clearly interaction from the user," *see* Ex. 25 at 4:4; *see also id.* at 8:20–:23, but ultimately this Court did not reach the defendants' motion for non-infringement because it found the claims invalid under § 102(b) due to the on-sale bar, *see* Ex. 26 at 13:15–:21.  Judgment was thus entered against PartsRiver on August 21, 2009.  *See* Ex. 27.  That judgment is final and no longer eligible for any appeal.

### G.    **Amendments made to claims 1 and 9 of the '821 patent during reexamination to try to circumvent the "divided infringement" problems identified in Case No. 09-811**

At the same time that claims 1 and 2 of the '821 patent were being litigated in this Court, the Patent Office was reexamining the validity of those claims.  The Patent Office could not consider the

-11-

1    AMP Navigator prior art that this Court used to invalidate the claims, however, because

2    reexaminations are limited to prior art consisting of patents or printed publications.[3]  Instead, the

3    reexamination focused on a printed publication called Granacki.  *See* '821 Reexam Exs. 1–2.

4         The Patent Office repeatedly rejected original claims 1 and 2 in light of the Granacki prior-

5    art reference.  *See* '821 Reexam Exs. 4, 6.  As a result, PartsRiver **narrowed** claims 1–4 to overcome

6    these rejections.  *See* '821 Reexam Ex. 15.  In particular, PartsRiver narrowed the preamble of

7    claims 1–4 to encompass only a client-server embodiment, and narrowed step (h) to require the

8    client to resubmit to the server both the first selection criteria and the second selection criteria.  *See*

9    *id.* at KS0000451.  At the same time, PartsRiver added new claim 9.  *See id.* at KS0000452–53

10   Reexamined claims 1 and 9 are very similar; PartsRiver told the Patent Office that "[t]he amendment

11   of claim 1 . . . adjusts the claim language of claim 1 to correspond to that of allowed claim 9."  *See*

12   *id.* at KS0000454.  In response, the Patent Office withdrew its prior-art rejection and allowed claims

13   1–4 and 9 as amended.  *See* '821 Reexam Ex. 16.

14        At the same time, however, PartsRiver **broadened** claims 1–4 and 9 in certain respects to try

15   to avoid the non-infringement argument that had been raised in Case No. 09-811.  As noted above,

16   the defendants had argued in their summary judgment motion that their websites could not infringe

17   original claims 1 and 2 because (among other reasons) the "accepting" step was performed on the

18   **user**'s computers, not the defendants' servers, thus creating a "divided infringement" problem.  *See*

19   *supra* Part III.F, p. 11 (citing Ex. 23 at 1:11–:15, 11:5–:14, 13:4–20:21).  In response, PartsRiver

20   amended claim 1 during reexamination, and added claim 9, to change the "accepting" step from an

21   action performed on the **user**'s computer to an action performed by the **server** computer, *see* '821

22   Reexam Ex. 15 at KS0000451–53, thus removing the "divided infringement" problem with respect

23   to the "accepting" step in claims 1–4 and 9.  PartsRiver also changed the "revising" step in claim 9

24

25        [3] In an *ex parte* reexamination, "[r]ejections will not be based on matters other than patents or
26   printed publications, **such as public use or sale.**"  *See* Manual of Patent Examining Procedure
     (MPEP) § 2258(I)(B), *available at*
     <http://www.uspto.gov/web/offices/pac/mpep/documents/2200_2258.htm#sect2258>; *see also* 35
27   U.S.C. §§ 301–302 (limiting *ex parte* reexamination requests to "prior art consisting of patents or
     printed publications").

28

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
Nos. 10-4947-CW, 11-1398-CW, 11-1548-CW, 11-2284-CW

in two respects.  First, it eliminated the requirement of "revising said feature screen" and instead claimed "revising **said data** for said feature screen."  Second, it changed the "revising" step from an action performed on the **user**'s computer to an action performed by the **server** computer, *see id.* at KS0000453, thus removing the "divided infringement" problem with respect to the "revising" step in claim 9.  These amendments are the basis for Defendants' argument that the asserted claims were broadened during reexamination and thus are invalid under 35 U.S.C. § 305.  However, PartsRiver did not amend the "displaying" step, or the "revising" step in claim 1, which is the basis for Defendants' argument that there is still a "divided infringement" problem in reexamined claims 1–4 and 9.

Reprinted below is the text of reexamined claims 1 and 9, with additions (as compared to original claim 1) shown by underlining and deletions shown by strikethrough.  *Compare* Ex. 2 (original patent), *with* Ex. 3 (reexamination certificate).  As discussed above, the method of original claim 1 is illustrated by the screenshots from the "AMP Navigator" program.  *See supra* Part III.B, pp. 3–7.

| **Reexamined Claim 1** | **Reexamined Claim 9** |
|---|---|
| 1.  A method for assisting a user in identifying a subfamily of items within a family of items <u>said method performed with a server connected to a client computer through a computer network</u>, comprising the steps of: | 9.  A method for assisting a user in identifying a subfamily of items within a family of items, <u>the method</u> comprising the <u>following</u> steps ~~of which are performed with a server connected to a computer network~~: |
| (a)  providing a computer readable data file of stored information representing at least one family of items, said data file identifying at least one alternative for each item, | (a)  providing a computer readable data file of stored information representing at least one family of items, said data file identifying at least one alternative for each item, |
| (b)  reading said data file, | (b)  reading said data file, |
| (c)  displaying a feature screen indicating said alternatives represented in the family, | (c)  displaying a feature screen indicating said alternatives represented in the family, <u>wherein data is output to a client computer via said computer network,</u> |
| (d)  accepting a first selection criteria of at least one alternative, | (d)  <u>receiving and</u> accepting a first selection criteria of at least one alternative <u>from said client computer, said first selection criteria being received by said server from said client computer via said computer network,</u> |
| (e)  determining a first subfamily of items wherein each said item in the first subfamily satisfies said first selection criteria, | (e)  determining a first subfamily of items wherein each said item in the first subfamily satisfies said first selection criteria, |

-13-

| Reexamined Claim 1 | Reexamined Claim 9 |
|---|---|
| (f)  determining available alternatives represented in the first subfamily, | (f)  determining available alternatives represented in the first subfamily, |
| (g)  revising said feature screen to indicate the available alternatives of the first subfamily, | (g)  revising said data for said feature screen to indicate the available alternatives of the first subfamily and outputting said revised data for said feature screen to said client computer via said computer network, |
| (h)  accepting a second selection criteria comprising from the client computer via said computer network at said server wherein the second selection criteria comprises a resubmission to the server of the alternative or alternatives of the first selection criteria plus at least one alternative selected from the revised feature screen, | (h)  receiving and accepting a second selection criteria comprising from said computer via said computer network, in which said second selection criteria comprises (1) a resubmission by said client computer of the alternative or alternatives of the first selection criteria plus along with (2) at least one alternative selected from the revised feature screen, |
| (i)  determining a second subfamily of items of the family wherein each item in the second subfamily satisfies said second selection criteria, | (i)  determining a second subfamily of items of the family wherein each item in the second subfamily satisfies said second selection criteria, |
| (j)  determining available alternatives represented in the second subfamily, and | (j)  determining available alternatives represented in the second subfamily, and |
| (k)  revising said feature screen to indicate the available alternatives of the second subfamily. | (k)  revising said data for said feature screen to indicate the available alternatives of the second subfamily and outputting said revised data for said feature screen to said client computer via said computer network. |

## H.   Overview of the present actions involving Kelora, a new entity created by Danish for the purpose of enforcing the '821 patent

While the '821 patent was being reexamined, Danish became the CEO of PartsRiver, *see* Ascolese Decl. Ex. 30, and caused PartsRiver to assign the '821 patent to a new entity that he created called Kelora, *see id.* Exs. 34–35, 37–39.  Both Danish and Kimbrough have a stake in Kelora.  *See* Ex. 29, at 2:7, :9

Kelora began enforcing the '821 patent a few days after the reexamination certificate issued on November 2, 2010.  *See* Ascolese Decl. Exs. 43, 46, 49.  There are presently four related actions in this Court involving Kelora, including two actions transferred from Wisconsin and Delaware. Kelora has asserted amended claims 1, 2, and 9 in all four actions against all Defendants, specifically against their shopping websites.  *See* Ex. 41 at 2:3–:11; Ex. 42 at 2:20–5:4.  Kelora has also asserted claim 3 in one of the actions (No. 10-4947), but only against eBay's ebay.com site (not its

1   shopping.com or stubhub.com sites).  *See* Ex. 41 at 2:10.  Kelora has also asserted claim 4 in three of

2   the actions (Nos. 10-4947, 11-1398, and 11-1548), but ***not*** against the following remaining

3   Defendants:  Nebraska Furniture Mart (NFM) in No. 11-2284, and Target, OfficeMax, Amazon,

4   Dell, Costco, and HP in No. 11-1548.  *See* Ex. 42 at 2:20–5:4.

5          This Court set the same schedule for claim construction and summary judgment in all four

6   related actions, *see* Ex. 33 at 9:21–10:5; Ex. 35 at 2, and requested that all Defendants file a single

7   opening brief of up to 60 pages, *see* Ex. 34 at 16:18–17:3, 20:24–21:7; Case No. 10-4947, ECF

8   No. 86.

9   **IV.   LEGAL STANDARDS**

10          The following is an overview of the legal standards relevant to this motion.  Additional

11   details about the relevant legal standards are provided in the argument sections.

12          **A.   Claim construction**

13          The leading case on claim construction is *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir.

14   2005) (en banc).  Under *Phillips*, the words of a claim limitation are generally given their ordinary

15   and customary meaning as understood by a person of ordinary skill in the art at the time of the

16   invention, *i.e.*, as of the effective filing date of the patent application (in this case October 14, 1994).

17   *See id.* at 1312–13.  The sources of information available to determine the meaning of claim terms

18   include the words of the claims themselves, the remainder of the specification, the prosecution

19   history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical

20   terms, and the state of the art.  *See id.* at 1314.  Of these sources, the specification "is the single best

21   guide to the meaning of a disputed term."  *Id.* at 1315.

22          **B.   Obviousness under 35 U.S.C. § 103**

23          The leading case on obviousness under 35 U.S.C. § 103 is *KSR International Co. v. Teleflex

24   Inc.*, 550 U.S. 398 (2007) (9-0 decision) (reversing and granting summary judgment of obviousness).

25   The Supreme Court rejected a "rigid approach" to obviousness and instead adopted a more flexible

26   approach that makes it easier to find a patent obvious.  *See id.* at 415–22.  The Supreme Court

27   reaffirmed that the four factors set forth in *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966) —

28   (i) the scope and content of the prior art, (ii) the differences between the asserted claims and the

-15-

prior art, (iii) the level of ordinary skill in the art, and (iv) secondary considerations of nonobviousness — provide the proper framework for considering obviousness.  *See id.* at 406–07, 415–18.  "[I]t must be remembered that the 'obviousness' test of § 103 is not one which turns on whether an invention is equivalent to some element in the prior art but rather whether the difference between the prior art and the subject matter in question 'is a difference sufficient to render the claimed subject matter unobvious to one skilled in the applicable art . . . .'"  *Dann v. Johnston*, 425 U.S. 219, 228 (1976) (7-0 decision) (reversing and finding software patent obvious).

### C.  **Summary judgment**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  An issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*

As shown by the cases cited below, this motion presents only questions of law that are routinely decided by summary judgment.

## V.  **ARGUMENT**

### A.  **Claims 1–4 and 9 are obvious in light of the Court's prior summary judgment ruling and known Internet and Web techniques**

All of the asserted claims are obvious in light of this Court's summary judgment ruling that the AMP Navigator software is § 102(b) "on-sale bar" prior art.  "Prior art under the § 102(b) on-sale bar is *also* prior art for the purposes of obviousness under § 103."  *Dippin' Dots, Inc. v. Mosey*, 476 F.3d 1337, 1344 (Fed. Cir. 2007) (affirming judgment of invalidity).

In the hope of avoiding another summary judgment of invalidity, Kelora has proposed a very narrow (and incorrect) claim construction for the preambles to independent claims 1 and 9, *see infra* Part V.E, p. 55, but regardless of whether *any* of Kelora's claim constructions are adopted, the asserted claims are still obvious for the reasons discussed below.

1

### 1.    Claims 1, 2, and 9 are obvious

2

#### a.    Overview

3       Because the Court has previously ruled that the AMP Navigator program is prior art that

4  anticipates original claims 1 and 2 (and Kelora is precluded from challenging that judgment), the

5  only remaining question before the Court is whether it would have been obvious to modify the AMP

6  Navigator to include the additional limitations added to independent claims 1 and 9 during

7  reexamination, namely (i) a client-server arrangement and (ii) a resubmission requirement for

8  iterative searches.  *See supra* Part III.G, pp. 13–14.  As discussed below, the additional limitations

9  are nothing more than well known prior art client-server and Internet (World Wide Web) techniques.

10  Thus, modifying the 1992 AMP Navigator to operate in a client-server environment or on the

11  Internet would have been nothing more than "mere application of a known technique to a piece of

12  prior art ready for improvement."  *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 417 (2007).

13

#### b.    Kelora is bound by the prior on-sale bar ruling

14       This Court's summary judgment of invalidity against PartsRiver is binding against Kelora as

15  the successor-in-interest to the '821 patent.[4]  In particular, this Court decided in Case No. 09-811

16  that claims 1 and 2 of the '821 patent were invalid under 35 U.S.C. § 102(b) due to the on-sale bar,

17  *see* Ex. 26, and it entered final judgment against PartsRiver, which owned the '821 patent at that

18  time, *see* Ex. 27.  PartsRiver (under the leadership of Danish) later assigned the '821 patent to

19  Kelora (an entity created by Danish).  *See* Ascolese Decl. Ex. 38; *see also* Ascolese Decl. Ex. A at

20  3:7–6:23 (discussing intimate relationship between Kelora and PartsRiver); *id.* Ex. 1 (timeline of

21  events).  After assigning the '821 patent to Kelora, PartsRiver (represented by the same counsel

22  representing Kelora) tried to vacate the judgment of invalidity, but this Court denied that motion, *see*

23  Ex. 31, and the deadline for appealing that order has passed.  Thus the judgment of invalidity is

24  complete, final, and as explained below, binding against Kelora.

25

26       [4] eBay and Microsoft have raised this issue with the Court before, *see* Ex. 36 at 13:16–14:22, 15
   n.5; Ex. 38 at 6:8–8:23, but the Court did not resolve the issue because it was not necessary to the

27  outcome of the Court's decision at that time.  However, the Court stated, "I'm inclined to think in
   the future that collateral estoppel will apply."  Ex. 39 at 32:4–:6.

28

1    Patents "have the attributes of personal property," 35 U.S.C. § 261, and one such attribute is

2    that "[a] judgment in an action that determines interests in real or personal property . . . [h]as

3    preclusive effects upon a person who succeeds to the interest of a party to the same extent as upon

4    the party himself," *Restatement (Second) of Judgments* § 43(1) (1982).  The Federal Circuit has

5    endorsed this rule: "[A] judgment with respect to a particular property interest may be binding on a

6    third party based on a transfer of the property in issue to the third party after judgment." *Int'l*

7    *Nutrition Co. v. Horphag Research, Ltd.*, 220 F.3d 1325, 1329 (Fed. Cir. 2000) (citing *Restatement*

8    *(Second) of Judgments* § 43 (1982)).  Thus, when a patent is found invalid, and a subsequent accused

9    infringer wants to use that earlier judgment of invalidity as a defense, "[i]t is clear that, to the extent

10   collateral estoppel is applicable, it is applicable also [against a subsequent assignee of the patents] as

11   a successor in interest to the patents."  *Westwood Chem., Inc. v. United States*, 525 F.2d 1367, 1370

12   n.5 (Ct. Cl. 1975) (applying collateral estoppel of invalidity against assignee);[5] *see also Hartley v.*

13   *Mentor Corp.*, 869 F.2d 1469, 1471–73 (Fed. Cir. 1989) (applying Ninth Circuit law and affirming

14   that prior summary judgment of invalidity due to the on-sale bar precluded relitigation of the same

15   issues).

16       All the elements of collateral estoppel (also known as issue preclusion) are present here.  In

17   Case No. 09-811, this Court's summary judgment ruling decided all of the following issues:

18    - Original claims 1 and 2 of the '821 patent were "on sale" in the United States before

19      October 14, 1993.  *See* Ex. 26 at 13:10–:14.

20    - The AMP Navigator program was a reduction to practice of each and every limitation

21      of original claims 1 and 2 of the '821 patent.  *See id.* at 11:9–:21.

22    - The AMP Navigator program was the subject of a "commercial offer for sale" before

23      October 14, 1993.  *See id.* at 8:21–10:25.

24    - The AMP Navigator program was "ready for patenting" before October 14, 1993.

25      *See id.* at 10:26–13:9.

---

26   [5] This decision is binding precedent on this Court because when the Federal Circuit was
27   established, it adopted all prior decisions by the Court of Claims as precedent.  *See South Corp. v.*
     *United States*, 690 F.2d 1368, 1370 (Fed. Cir. 1982) (en banc).
28

- The AMP Navigator was not an "experimental use." *See id.* at 10:17–:25, 11:22–12:6.

Kelora therefore is precluded from relitigating these issues because (i) the issues at stake in this case are identical to the ones alleged in the prior litigation (see the issues listed above), (ii) the issues were actually litigated by the party against whom preclusion is asserted in the prior litigation (PartsRiver actually litigated all the issues listed above, and as the successor-in-interest Kelora is bound by the Court's ruling against PartsRiver as discussed above), and (iii) the determination of the issues in the prior litigation was a critical and necessary part of the judgment in the earlier action (all of the issues listed above were necessary to this Court's summary judgment ruling). *See, e.g.*, *Trevino v. Gates*, 99 F.3d 911, 923 (9th Cir. 1996) (applying collateral estoppel)).

Accordingly, collateral estoppel applies, and Kelora cannot challenge that the AMP Navigator — which practices all of the limitations of original claims 1 and 2 — is ***prior art*** under § 102(b) to the reexamined claims. *See supra* Part III.B, pp. 3–7 (showing the AMP Navigator prior art); pp. 13–14 (showing the differences between original claim 1 and reexamined claims 1 and 9).

## c.   Client-server databases, the World Wide Web, and resubmission of search terms were all well known

By 1994,[6] there was nothing novel about (i) operating a database in a client-server arrangement (including the World Wide Web) as required by the preambles of amended claims 1

_____

[6] For purposes of obviousness, the relevant prior art date is October 14, 1994 (the effective filing date of the patent application that resulted in the '821 patent, *see* Exs. 2, 6) because the inventors cannot corroborate conception or diligent reduction to practice before that date.  In response to an interrogatory requesting that Kelora identify facts supporting any contention of conception of the asserted claims prior to October 14, 1994, Kelora responded:

Kris Kimbrough and Sherif Danish are witnesses to conception.

The conception happened at Danish International, which is a small company that has not retained documents from that period of time. Any potentially relevant computerized records for Danish International were lost when a computer was stolen on or before September 26, 2000.

Ex. 15 at 6:2–:5.

As a matter of law, inventor testimony without corroborating evidence (such as an inventor notebook witnessed by another) is insufficient to support a claim of prior conception:  "It is well established that when a party seeks to prove conception via the oral testimony of a putative inventor, the party ***must*** proffer evidence corroborating that testimony." *Procter & Gamble Co. v. Teva Pharmaceuticals USA, Inc.*, 566 F.3d 989, 999 (Fed. Cir. 2009); *see also Mahurkar v. C.R. Bard,*

*(Footnote continued)*

1    and 9 or (ii) resubmission of search terms to the server as required by step (h) in amended claims 1

2    and 9.

3           The '821 patent specification does not purport to have invented client-server arrangements,

4    World Wide Web servers, or World Wide Web Browsers, nor did the applicants ever contest the

5    Examiner's statement that client-server arrangements were well-known and an obvious configuration

6    for a database application.  Indeed, the '821 patent specification states "[t]he server 125 may have

7    hardware access to the Internet *via any conventional method*" and goes on to identify specific

8    existing third party World Wide Web server and client browser software.  *See* Ex. 2 at 18:18–:32

9    (emphasis added).  Moreover, the '821 patent specification does not purport to add any additional

10   faceted navigation concepts to the Internet embodiment not also found in the standalone embodiment

11   that this Court found to be in the prior art.  *See id.* at 18:33–:35 ("A preferred embodiment of the

12   Internet embodiment of the electronic catalog application mirrors the user flow in the local

13   embodiment as much as possible.").

14          Thus, the only element of amended claims 1 and 9 that is arguably not part of the offered-for-

15   sale AMP Navigator or admitted as prior art in the '821 patent is the concept of resubmission in

16   iterative searching.  As discussed in detail below, that concept was well known generally, as well as

17   specifically in client-server embodiments, especially World Wide Web embodiments.

18                              **i.      Client-server arrangements, including the**
                                        **World Wide Web were well known**
19

20          By 1994, it was well known that a database on a local computer could be adapted to operate

21   in a client-server arrangement.  For example, Japanese Laid Open Patent Application No. S64-1030

22   to Suzuki ("*Suzuki*"), published January 5, 1989, also discloses a "file searching method" where the

23

24   *Inc.*, 79 F.3d 1572, 1576–79 (Fed. Cir. 1996) (similar).  Kelora's interrogatory response identifies no
     witnesses other than the two named inventors and identifies no corroborating evidence.  Thus, as a
25   matter of law, Kelora is not entitled to a priority date earlier than October 14, 1994.

26          Regardless, the concepts discussed above were indisputably known by others and described in
     printed publications more than one year prior to the earliest filing date to which the '821 patent
27   claims priority and are thus prior art under § 102(b) regardless of whether Kelora can show an earlier
     conception date.
28

                              DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
                              Nos. 10-4947-CW, 11-1398-CW, 11-1548-CW, 11-2284-CW

1   user may conduct a series of narrowing searches.[7]  *See* Leventhal Decl. Ex. 2 (certified English

2   translation).  *Suzuki*, like the '821 patent, discloses both local (Fig. 1) and client-server (Fig. 8)

3   embodiments, thus emphasizing the interchangeability of the two embodiments.  PC Magazine's

4   1993 book *Guide to Client/Server Databases* describes advantages of utilizing a client-server

5   arrangement.  *See* Leventhal Decl. Ex 3 at 2.  For example, it discloses that a client-server

6   arrangement is beneficial because "Client/Server database increases database processing power by

7   separating the DBMS [Database Management System] from the database application."  *Id.*

8   During prosecution of the '444 patent (the grandparent to the patent-in-suit), the Patent

9   Office addressed several dependent claims that recited client-server arrangements and stated that

10  while the cited art did not explicitly include such arrangements, "the examiner takes official notice

11  that client server systems are well known in the art and it would have been obvious to one of

12  ordinary skill in the DP art at the time of the applicant's invention to provide the invention also on a

13  client server system as that would provide a wider range of utilization."  '444 Prosecution, No. 7,

14  ¶ 28.  The applicants did not dispute the Examiner's position.  '444 Prosecution, No. 10.

15  One well known client-server arrangement was the World Wide Web, which was developed

16  at CERN by a physicist named Tim Berners-Lee starting in 1989.  *See* Leventhal Decl. Ex. 5 at 227

17  (book from 1992 describing the Web); *id.* Ex. 6 (printout from <http://info.cern.ch/>).  A World

18  Wide Web arrangement consists of a server and client-side browser, which were both known and

19  available from third parties as detailed in the '821 patent specification.  *See* Ex. 2 at 18:18–:32.

20  Moreover, a well known use of the World Wide Web was to host database applications.  For

21  example, Jason Ng of the National Center for Supercomputing Applications at the University of

22  Illinois released by December 1993 "a gateway program that provides a forms interface in Mosaic to

23  SQL databases."  Leventhal Dec. Ex. 14 at PA-008244.[8]  SQL is a well-known acronym that stands

---

24  [7] *Suzuki* was published more than one year prior to the earliest filing date to which the '821
25  patent claims priority and is thus prior art under § 102(b) regardless of whether Kelora can show an
    earlier conception date.  While Defendants do not move for summary judgment on this basis,
26  Defendants contend that *Suzuki* anticipates at least amended claims 1 and 9.

27  [8] Exhibit 14 to the Leventhal Declaration comprises three webpages:  Ng, *GSQL - a Mosaic-SQL
    gateway* (Dec. 1993), available at <ftp://ftp.ncsa.uiuc.edu/Web/tools/gsql/back/starthere.html>; Ng,
    *GSQL in detail* (Dec. 1993), *available at* <ftp://ftp.ncsa.uiuc.edu/Web/tools/gsql/back/howto.html>;
28  *(Footnote continued)*

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
Nos. 10-4947-CW, 11-1398-CW, 11-1548-CW, 11-2284-CW

1   for "Structured Query Language."  Leventhal Decl. Ex. 3 at 27.  It is a common format used to query

2   databases on a server.  *See id.*

3          **ii.      Resubmission was known *and* preferred in
                       the World Wide Web environment**

4

5          By 1994, it was also well known that resubmission could be used to perform iterative

6   narrowing searches.  This concept is found at least in three places: (i) the offered-for-sale AMP

7   Navigator itself, (ii) the 1989 *Suzuki* reference discussed above, and, perhaps most significantly

8   (iii) evidence showing that those of ordinary skill in the art recognized resubmission as the ***preferred***

9   approach for performing iterative narrowing queries in a World Wide Web environment.

10         As an initial matter, the AMP Navigator itself included resubmission and thus any

11  modification of AMP Navigator to operate in a client-server arrangement would include this

12  functionality without further modification.[9]  Specifically, inventor Kimbrough testified that "I think

13  every version [of the invention] we built always did concatenated search," which would include the

14  1992 AMP Navigator that was offered for sale.  Ex. 14 at 118:14–:15.  Kimbrough explained that by

15  "concatenated search," he was referring to a search where both the first selection by the user and a

16  subsequent second selection by the user are resubmitted to the database performing the search.  *See*

17  *id.* at 106:15–108:11.

18         As another example, *Suzuki* discloses a "file searching method" where the user may conduct

19  a series of narrowing searches where each subsequent narrowing search is performed by

20  resubmitting the criteria of the prior search along with a newly-added term.  *See* Leventhal Decl. Ex.

21  2.  Specifically, *Suzuki* describes performing a first search for files containing the keyword

22  "COMPUTER" and then permitting the user to perform a second narrowing search:

23  ──────────────────

24  and Ng, *GSQL PROC file commands* (Dec. 1993), *available at*
    <ftp://ftp.ncsa.uiuc.edu/Web/tools/gsql/back/proc-fmt.html>.

25         [9] As discussed above, Kelora is estopped as a matter of law from contesting that there was an
26  offer for sale encompassing the AMP Navigator and that the scope of that offer included all elements
    of original claims 1 and 2.  *See supra* Part V.A.1.b, pp. 17–19.  Whether the AMP Navigator
27  included resubmission was not at issue, and thus was not decided, in the original litigation.
    Nevertheless, inventor Kimbrough's testimony that the AMP Navigator did include resubmission
    stands uncontested.

28

1 | Accordingly, an operation to add the new search keywords is required.
2 | The desired keywords are identified by moving the mouse 3, thereby moving the cursor 21 in an associating manner to the position of the desired keywords.  Such a function saves the effort to input search
3 | keywords one by one using the keyboard 2.  For example, when the cursor 21 is moved to the search keywords "ARTIFICIAL
4 | INTELLIGENCE" and the mouse button is pressed down, ***search processing is performed using a logical expression of search***
5 | ***keywords (COMPUTER ∩ ARTIFICIAL INTELLIGENCE) in which search keywords "ARTIFICIAL INTELLIGENCE" are***
6 | ***added to the previously inputted search keyword "COMPUTER".*** Moreover, it is also possible to conduct a search by further adding
7 | search keywords "VOICE RECOGNITION" (COMPUTER ∩ ARTIFICIAL INTELLIGENCE ∩ VOICE RECOGNITION).

*Id.* at 6.  Suzuki further explains: "In the information above, the symbol '∩' is one symbol used for a logical operation and is a mark which means 'AND' (the logical multiplication operation)."  *Id.* at 3.

Thus, the search expression "COMPUTER ∩ ARTIFICIAL INTELLIGENCE" is a resubmission of the original term "COMPUTER" along with the user's subsequent narrowing term "ARTIFICIAL INTELLIGENCE."

Moreover, utilizing resubmission to perform iterative narrowing searches was specifically known and recognized not only as a possible approach, but as a ***preferred*** approach in the World Wide Web environment.  In the World Wide Web, clients and servers communicate with each other using the HyperText Transfer Protocol ("HTTP").  One of the known characteristics of HTTP is that the "protocol is stateless, in that no state is kept by the server on behalf of the client."  Leventhal Decl. Ex. 8 (quoting Tim Berners-Lee, *HyperText Transfer Protocol* (available on http://info.cern.ch website on Nov. 3, 1992)); *see also id.* Ex. 7 at PA-3370 ("The server need not store any information about the request after disconnection.").  Statelessness means that when a user at a client device wishes to perform a second narrowing query, the server has no knowledge of the first query.

The prior art demonstrates that resubmission of all search terms was a known and preferred solution to performing queries on a stateless World Wide Web server.  Specifically, a posting to the WWW-Talk listserve[10] in May 1994[11] by Nick Arnett of California specifically identifies

---

[10] The WWW-Talk listserve was well known among persons of ordinary skill at the time.  For example, a March 1993 book, Internet Passport, directs its readers to sign up for the WWW-Talk listserve for more information about the World Wide Web and describes the list as "discussion

*(Footnote continued)*

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
Nos. 10-4947-CW, 11-1398-CW, 11-1548-CW, 11-2284-CW

resubmission as a preferred solution to the iterative searching in a stateless World Wide Web

system:  "My experience so far tells me that when the user wants to perform multiple queries and

transfers, it's because they are somehow related to one another.  ***I'm attacking that problem by***

***passing parameters, which are kept by the \*browser\* and <ins>re-sent</ins>.***"  *See* Arnett Decl. ¶¶ 7–8

(confirming date and authenticity of his listserve posting) (emphasis other than "\*" added).  That

same posting quotes another user, Jared Rhine, also of California, reaching the same conclusion: "If

the protocol is completely stateless (as any MIME-oriented MGET proposal is), ***it will have to***

***<ins>resend</ins> the entire query, forcing the server to do all the processing again.***"  *Id.* ¶¶ 9–10.

In short, it is indisputable that resubmission was not only a known technique for submitting

subsequent narrowing queries to a database, it was a ***preferred*** technique in the World Wide Web

context where a standard WWW server is stateless.

### d.  It would have been obvious to modify AMP Navigator to include all the elements of amended claims 1, 2, and 9

The World Wide Web and techniques for developing World Wide Web embodiments were

all well known.  Indeed, the Federal Circuit has repeatedly held that adapting existing systems to

include Internet/web functionality is obvious.  *See W. Union Co. v. MoneyGram Payment Sys., Inc.*,

626 F.3d 1361, 1370–71 (Fed. Cir. 2010) (reversing jury verdict and finding as a matter of law that

adding "internet-based communications" to a money-transfer system would have been obvious);[12]

---

among W3 developers (A good place for W3 users to share experiences and ask questions about W3 not addressed in the W3 online information)."  Leventhal Decl. Ex. 12 at 318.

[11] This May 1994 date is prior to the earliest date that Kelora can prove conception.  *See supra* p. 19, note 6.  Thus, the Arnett WWW-Talk posting is prior art under two different provisions of § 102(a): (i) it is evidence that the resubmission concept was known to others (at least Nick Arnett and Jared Rhine) in this country, and (ii) it is a printed publication that describes the resubmission concept.  The Arnett WWW-Talk posting is a printed publication because it was disseminated and sufficiently available to the interested public.  *See, e.g.*, *Kyocera Wireless Corp. v. ITC*, 545 F.3d 1340, 1350–51 (Fed. Cir. 2008).  Specifically, the Arnett WWW-Talk posting was a printed publication in two separate forms: it was immediately distributed to all members of the WWW-Talk listserve, and it was also available to the public through web-based archives.  *See* Arnett Decl. ¶¶ 4–7.

[12] The court in *Western Union* followed *Papyrus Tech. Corp. v. N.Y. Stock Exch., LLC*, 653 F. Supp. 2d 402, 432 (S.D.N.Y. 2009) (finding that adding "a connectionless protocol (TCP/IP) . . . such as the Internet" to other obvious elements of claim "adds nothing new to the field of endeavor"), *aff'd*, 396 Fed. Appx. 702 (Fed. Cir. Oct. 7, 2010), *cert. denied*, 131 S. Ct. 1518 (2011).

1    *Dow Jones & Co. v. Ablaise Ltd.*, 606 F.3d 1338, 1349–53 (Fed. Cir. 2010) (affirming summary

2    judgment of obviousness given motivation between 1990 and 1995 to "bring the established features

3    of various computer programs to the web platform"); *Muniauction, Inc. v. Thomson Corp.,* 532 F.3d

4    1318, 1326 (Fed. Cir. 2008) (reversing jury verdict and finding as a matter of law that combining

5    prior-art device with web browser functionality "represent[ed] a combination of two well known

6    prior art elements to a person of ordinary skill in the art").

7                               **i.    AMP Navigator in combination with known**
                                        **client-server and World Wide Web art**
8                                       **includes all elements of amended claims 1, 2,**
                                        **and 9**
9

10           AMP Navigator in combination with any of (i) admitted known WWW clients and servers

11   and Kimbrough's testimony regarding use of resubmission searching; (ii) the Arnett WWW-Talk

12   post; or (iii) *Suzuki*,[13] would each render obvious a system that meets all the limitations of amended

13   claims 1, 2 and 9.  The Patent Office has never considered any of these combinations because during

14   reexamination it was not permitted to take the AMP Navigator prior art into consideration.  *See*

15   *supra* p. 9, note 3.  Claim charts attached as Exhibit 1 to the Leventhal Declaration illustrate each of

16   these combinations.

17                              **ii.   The prior art provides explicit motivation to**
                                        **combine**
18

19           As detailed above, client-server arrangements were both known and known to be

20   interchangeable with local embodiments of database applications, as demonstrated, for example, by

21   *Suzuki.  See supra* Part V.A.1.c.i, pp. 20–22.  The prior art also detailed advantages to client-server

22   arrangements, including "increasing database processing power."  *See id.*  The World Wide Web

23   was a known client-server arrangement, as demonstrated by the listing of known third party WWW

24   servers and client browsers in the '821 patent.  *See* Ex. 2 at 18:18–:32.  Moreover, WWW browsers

25   were available for multiple operating systems, providing an advantage over proprietary database

26   _____

27         [13] To the extent the Court adopts Kelora's improperly narrow construction of the preamble, it
     would still be obvious to substitute the generic client-server arrangement disclosed in *Suzuki* with the
     known World Wide Web client-server arrangement.

28

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
Nos. 10-4947-CW, 11-1398-CW, 11-1548-CW, 11-2284-CW

interface that required additional software for client access.  *See* Part V.A.1.c.i, pp. 20–22.  Thus, the prior art demonstrates that modifying AMP Navigator to operate in a client-server arrangement generally, or in a World Wide Web embodiment specifically, would have been nothing more than applying a known technique to improve AMP Navigator in the same way.  *See KSR Int'l Co.*, 550 U.S. at 416.

Similarly, resubmission was one known way to perform iterative narrowing searches, as demonstrated by *Suzuki*.  *See supra* Part V.A.1.c.ii, p. 22.  Therefore, even if the AMP Navigator itself did not include resubmission (which would be contrary to the testimony of Kimbrough), to utilize resubmission would have been nothing more than "the simple substitution of one known element for another."  *KSR Int'l Co.*, 550 U.S. at 417.  More importantly, as demonstrated by Nick Arnett's WWW-Talk posting, those of ordinary skill in the art had long recognized that resubmission was a known and ***preferred*** technique in the World Wide Web context where a standard WWW server is stateless.  *See supra* Part V.A.1.c.ii, p. 24.  Thus, one of ordinary skill in the art would have been motivated to utilize this known technique to improve AMP Navigator in the same way it had been used to improve other devices.  *See KSR Int'l Co.*, 550 U.S. at 416.

### iii.  The general knowledge of those in the art provides additional motivation to combine

In addition to the prior art and Examiner's comments discussed above, additional evidence of the knowledge generally available to those of ordinary skill in the art further demonstrates that one of ordinary skill in the art would have been motivated to modify AMP Navigator into an Internet embodiment utilizing resubmission.  *See Nat'l Steel Car, Ltd. v. Canadian Pac. Ry., Ltd.*, 357 F.3d 1319, 1337 (Fed. Cir. 2004) ("It has long been the law that the motivation to combine need not be found in prior art references, but equally can be found 'in the knowledge generally available to one of ordinary skill in the art.'" (internal citations omitted)).

During reexamination, Kelora conceded that there was a design need to avoid keeping track of a user's previous search terms on the server:  "If the webserver has to identify and track individual sessions with each such user in order to know what criteria the user previously searched in earlier search iterations, there is clearly a tremendous overhead load on the webserver to service such

1    individual search sessions." '821 Reexam, Ex. 5, at 10.  As such, there was an obvious design need

2    for the client to resubmit search terms so that the server did not need to have the memory that

3    otherwise would be necessary to "remember" all the previous searches by each client.

4         Furthermore, inventor Danish explained in a book he wrote that "the Internet came along"

5    and "solved the chicken-and-egg dilemma.  It offered inexpensive access to millions of users, and it

6    provided an easy and attractive way to publish information (HTML pages).  The critical mass of

7    users was attained in early 1994."  Leventhal Decl. Ex. 4 at 6.  Thus, Danish admits that the very

8    nature of the Internet itself motivated those of ordinary skill in the art to modify existing systems to

9    operate on the World Wide Web.

10        In yet another example, in a paper presented at the First International Conference on the

11   World-Wide Web in May 1994,[14] a team described a project conducted at NASA in late 1993

12   seeking to migrate an existing database to a new web-based interface called the "MORE Interface."

13   *See* Leventhal Decl. Ex. 13.  The authors' description of their efforts demonstrates both that those of

14   ordinary skill in the art were motivated to adapt existing database systems to work on the World

15   Wide Web and that such adaptation was well within the skill level at the time:  "We became aware

16   of the World Wide Web and the NCSA Mosaic viewer in mid 1993.  Over the next few months we

17   discussed the feasibility of using Mosaic as a display mechanism for the" database.  *Id.* at 286.

18   When the authors made the decision to pursue a web embodiment, "[t]he learning curve for

19   developing script programs for the generation of dynamic HTML pages was short" and it took only

20   "one week" to develop "a fully functional interface."  *Id.*

21        As yet another example, three papers — *Pollitt*,[15] *Ellis*,[16] and *Pollitt 1994*,[17] — each describe

22   the efforts of a team in 1992 and 1993 that developed HIBROWSE, a hypertext-based client

23        [14] *See* <http://www94.web.cern.ch/www94/Welcome.html>.

24        [15] Pollitt, A.S. et al., "HIBROWSE: Adding the Power of Relational Databases to the Traditional
     IR Architecture — The Future for Graphic User Interfaces," *15th BCS IRSG Research Colloquium*
25   *in Information Retrieval, Strathclyde University*, March 1993 ("*Pollitt*"), *available at* Leventhal
     Decl. Ex. 16.

26        [16] Ellis, G.P. et al., "HIBROWSE for Hotels: Bridging the Gap Between User and Systems
27   Views of a Database," IDS'94 Workshop on User Interfaces to Databases, April 1994, Lancaster,
     UK ("*Ellis*"), *available at* Leventhal Decl. Ex. 17.

28

interface for communicating with a database on a server that allowed the user to perform the same type of searching as claimed in the '821 patent: "The underlying relational database, stored and accessed using ORACLE, is presented through a summary of the attribute values for the field in the main table . . . . The way in which a search for unknown items with known attribute values is achieved is by selecting attribute values from those displayed in the summary windows." Leventhal Decl. Ex. 16, at 112. As illustrated in Exhibit 15 of the Leventhal Declaration, when viewed side-by-side, the screenshots of HIBROWSE (which used a client/server arrangement) are remarkably similar to the screenshots of the AMP Navigator program (which used a standalone computer).

The evidence also confirms that those of ordinary skill in the art recognized resubmission was a preferred approach in the World Wide Web context for performing iterative narrowing searches. For example, in discussing the lessons learned in developing the MORE Interface discussed above, the authors recognized that "[c]hanging from a state environment to the stateless environment of HTML would require a new architectural design for the system. The system would change from one monolithic program which required users to maintain a sustained session on the server to a series of short disjunct sessions lasting only long enough to generate the next HTML page." *Id.* at 10.

For all of these reasons, it would have been obvious to modify the 1992 AMP Navigator to operate on the Internet using resubmission for narrowing iterative searches. The combinations satisfy all limitations of claims 1, 2, and 9 as illustrated by the claim chart in Exhibit 1 to the Leventhal Declaration.

### e.   Giving due weight to all *Graham* factors, summary judgment is appropriate

"Where, as here, the content of the prior art, the scope of the patent claim, and the level of ordinary skill in the art are not in material dispute, and the obviousness of the claim is apparent in light of these factors, summary judgment is appropriate." *KSR Int'l Co.*, 550 U.S. at 427.

---

[17] Pollitt, A.S. et al., "HIBROWSE for Bibliographic Databases," *Journal of Information Science* 20(6) (1994) 413–26 ("*Pollitt 1994*"), *available at* Leventhal Decl. Ex. 18.

-28-

1    The first two *Graham* factors — the scope and content of the prior art and the differences

2    between the asserted claims and the prior art — have been discussed in detail above.  *See supra* Parts

3    V.A.1.c–d, pp. 19–28.  Kelora is precluded from contesting that all the elements of original claims 1

4    and 2 are in the prior art (given this Court's previous summary judgment ruling) and the many

5    references discussed above demonstrate that client-server Internet embodiments and narrowing

6    iterative searches through resubmission were known in the prior art, and one of ordinary skill in the

7    art would have been motivated to modify the 1992 AMP Navigator to include those elements.  *See*

8    *id.*

9    The third *Graham* factor — the level of ordinary skill in the art — weighs in favor of a

10   finding of obviousness because even viewing the level of skill as low,[18] most favorably to Kelora,

11   the claims remain undeniably obvious in light of the explicit teachings and motivations to combine.

12   *See, e.g.*, *Tokai Corp. v. Easton Enters. Inc.*, 632 F.3d 1358, 1369 (Fed. Cir. 2011).  In any event, the

13   references discussed above show that persons of ordinary skill were familiar with all the relevant

14   technologies, including client/server arrangements, databases, and resubmission of search terms.

15   For the final *Graham* factor — secondary considerations of nonobviousness — there is no

16   evidence supporting Kelora's position.  *See* Leventhal Decl. Ex. 24.  Specifically, one of the

17   Defendants served an interrogatory requesting that Kelora identify "all Secondary Considerations

18   that you contend support a conclusion that the Asserted Claims are non-obvious, including all

19   facts . . . ."  *Id.* at 11.  Kelora failed to identify any facts in its response.  *Id.*

20                    *     *     *     *     *

21   For all of these reasons, claims 1, 2, and 9 are obvious in light of this Court's summary

22   judgment ruling that the AMP Navigator program is § 102(b) prior art.

23   **2.      Dependent claim 3 is also obvious**

24   Dependent claim 3 adds the requirement of providing information (e.g., pop-up "help") when

25   the user points the mouse at one of the "features" on the screen:

26   

27   [18] For purposes of this motion, a low level of skill in the art would be a person with a moderate
     level of computer science experience acquired through either formal or informal training.

28   

-29-

1

2

> The method according to claim 2 and further comprising the step of:
> providing an interactive pointer and displaying information specific to
> one of said features upon a user initiated signal when said pointer is
> pointing to a feature caption on said feature screen.

3

4

Ex. 2 at 20:12–17.

5

Claim 3 in the '821 patent is identical to claim 4 in the '444 patent (the grandparent to the

6

patent-in-suit), *see* Ex. 6 at 20:7–:12, and the prosecution of the '444 patent shows that there is

7

nothing new or non-obvious about the claim.  During prosecution of the '444 patent, claim 4 was

8

originally numbered claim 10.  *See* '444 Prosecution, No. 1, at 41:31–:36.  The Examiner repeatedly

9

rejected claim 10 in light of the prior art, and the applicants never overcame those rejections on the

10

merits.  First the Examiner rejected the claim in light of U.S. Patent No. 4,905,094 to Pocock (Ex. 8).

11

*See* '444 Prosecution, No. 2, at 5–6.  The applicants did not dispute that all the limitations in claim

12

10 were taught by Pocock; instead the applicants made amendments to the *independent* claim to

13

distinguish Pocock.  *See id.*, No. 4, at 18.  Next the Examiner rejected claim 10 in light of U.S.

14

Patent No. 5,544,360 to Lewak (Ex. 10).  *See* '444 Prosecution, No. 7, at 3.  Again the applicants did

15

not dispute that all the limitations in claim 10 were taught by Lewak; instead the applicants argued

16

that their invention date predated Lewak's effective filing date of November 23, 1992, and thus

17

Lewak was not prior art.  *See id.*, No. 10, at 1–2.  In the present case, however, it is admitted that the

18

asserted claims were invented *after* November 23, 1992, meaning Lewak *is* prior art.  *See* Ex. 15, at

19

5:23–:24.  Thus if claims 1 and 2 of the '821 patent are found invalid in light of the prior art, then

20

claim 3 of the '821 patent should also be found invalid for at least the reasons discussed during

21

prosecution of the '444 patent.

22

Claim 3 is also obvious in light of the context-sensitive "help" systems that existed before

23

1994 for both Macintosh and Windows computers — neither of which were considered during

24

prosecution of the '821 patent.  For example, Macintosh computers had "Balloon Help."  Reprinted

25

below is a magazine ad from 1991 for Balloon Help.  According to the ad, "Point to anything—a

26

menu item, icon, or tool—and a balloon appears, telling you what it is and what it does":

27

28

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
Nos. 10-4947-CW, 11-1398-CW, 11-1548-CW, 11-2284-CW



*Introducing Balloon Help. Point to anything—a menu item, icon, or tool—
and a balloon appears, telling you what it is and what it does. Balloon Help
is available in the Apple Finder™ and in a new generation of applications.*

Leventhal Decl. Ex. 19.  An article published in May 1993 provides additional information about

Balloon Help:  "These balloons, which are named after the balloons used in comic book dialog,

appear at the location of the hot spot.  Each balloon has a 'tip' that points precisely at the hot

interface object."  Leventhal Decl. Ex. 20 at PA-6307.

Windows computers also had context-sensitive help before 1994.  Reprinted below is Figure

4A from U.S. Patent No. 5,436,637, which was filed on March 5, 1993, and thus is § 102(e) prior art

to the '821 patent:

1
2
3
4
5
6
7
8
9
10
11



12   Leventhal Decl. Ex. 21 fig.4A; *see also id.* at 11:17–:44 (describing fig.4A).  In this example, the

13   "help" is shown in the bottom-left corner of the screen (items 406, 408) as the mouse moves across

14   different choices (items 405, 407).

15          It would have been obvious to modify the AMP Navigator program to provide context-

16   sensitive help as taught by Balloon Help or U.S. Patent No. 5,436,637.  The AMP Navigator

17   program already had a "Help" button on the right side.  *See, e.g.*, *supra* p. 7.  According to the

18   Supreme Court, "if a technique has been used to improve one device, and a person of ordinary skill

19   in the art would recognize that it would improve similar devices in the same way, using the

20   technique is obvious unless its actual application is beyond his or her skill."  *KSR*, 550 U.S. at 417.

21   There is no evidence that implementing context-sensitive help was beyond the capabilities of a

22   person of ordinary skill in 1993.  To the contrary, the article on Balloon Help in 1993 states that

23   "software developers can put balloons almost anywhere, ***and the process is relatively easy*** . . . ."

24   Leventhal Decl. Ex. 20 at PA-6307.  Indeed, one of the primary criticisms of Balloon Help was that

25   "[i]t is not, after all, a stunning technological advance."  *Id.*

26          For all of these reasons, claim 3 is obvious in light of the prior art.

27
28

### 3.   Dependent claim 4 is also obvious

Claim 4 is dependent from claim 2 and adds the limitation "wherein at least one of said groupings is **hidden** from view if all said respective alternatives are not available."  Removing unavailable alternatives from the user's screen was well known in the prior art, including U.S. Patent Nos. 4,843,538 and 5,544,360.  *See, e.g.*, Leventhal Decl. Ex. 22, Abstract ("Only those groups, subgroups and processes which are available for selection are displayed in the dynamic menu."); *id.* Ex. 23 at 12:21–:31 (describing that categories that would result in no matching files "may simply not be displayed").  The *Suzuki* reference also discloses hiding alternatives that are unavailable, as illustrated in Figures 3 and 4:




There are only a finite number of predictable ways to indicate to a user that a group of alternatives is unavailable.  *See KSR*, 550 U.S. at 421.  For example, the AMP Navigator grayed out unavailable alternatives, while the '538 patent, '360 patent, and *Suzuki* reference simply removed unavailable groups of alternatives.  As such, it would have been obvious to one of ordinary skill in the art to modify the AMP Navigator to simply remove groups of unavailable alternatives.  Indeed, the Examiner in the '444 patent prosecution reached this conclusion and the applicants did not contest it.  *See* '444 Prosecution, Nos. 2 & 3.  Specifically, the Examiner stated that the cited art did not disclose hiding grouping from view, "but it would have been obvious to one of ordinary skill at the time of the invention to have done [so] because of the reduction in the amount of time wasted in showing groups which the user could not select . . . ."  *Id.*, No. 2 at 6.

For all of these reasons, claim 4 is obvious in light of the prior art.

**B.    Invalidity under 35 U.S.C. § 305: claims 1–4 and 9, as amended during reexamination, are impermissibly broader than any original claim**

If the Court does not invalidate claims 1–4 and 9 in light of the prior art discussed above, then the Court should invalidate those claims for a separate and independent reason: during reexamination, those claims were impermissibly **broadened** and are thus invalid under 35 U.S.C. § 305.  This invalidity argument turns primarily on the proper construction of the terms "revising" and "accepting"[19] before and after the amendments made during reexamination.

The argument for invalidity under § 305 can be summarized as follows:  Kelora knew from the summary judgment motion in Case No. 09-811 that the original claims had a "divided infringement" problem because the "accepting," "displaying" and "revising" steps were performed on the **user**'s computers, not eBay's and Microsoft's servers.  *See generally supra* Part III.F, p. 11 (summarizing motion for summary judgment in Case No. 09-811).  Kelora apparently was concerned about these "divided infringement" problems, so during reexamination, Kelora amended claim 1, and added claim 9, to change the "accepting" step from an action performed on the **user**'s computer to an action performed by the **server** computer.  *See generally supra* Part III.G, pp. 11–14 (summarizing amendments made during reexamination).  Kelora also changed the "revising" step in claim 9 from an action performed on the **user**'s computer to a different action performed by the **server** computer.  *See id.*  As a result of these amendments, claims 1–4 and 9 were **broadened** because they no longer included those limitations involving the user's computer — which is impermissible under § 305 and means the claims must be found invalid:  "A claim that is broader in **any** respect is considered to be broader than the original claims even though it may be narrower in other respects."  *In re Freeman*, 30 F.3d 1459, 1464 (Fed. Cir. 1994) (internal quotation marks omitted) (holding that language added during reexamination impermissibly broadened the claims, making them invalid).

---

[19] In Case No. 10-4947, eBay and Microsoft filed a motion for summary judgment earlier this year arguing that the amended claims were invalid under § 305 based on their use of the term "accepting," but the Court denied the motion "without prejudice to renewal in connection with [Defendants'] motion for claim construction and summary judgment."  Ex. 40 at 10:11–:12.  Accordingly, Defendants are renewing this argument now.

1          The argument for invalidity under § 305 is discussed in more detail below:

2                    1.         **Legal standards for § 305**

3          During reexamination, claims are only supposed to be ***narrowed***.  *See* 35 U.S.C. § 305.  If

4     claims are ***broadened*** during reexamination, then they are invalid.  *See, e.g.*, *Quantum Corp. v.*

5     *Rodime, PLC*, 65 F.3d 1577, 1582–84 (Fed. Cir. 1995) (invalidating claims broadened during

6     reexamination); *see also Thermalloy, Inc., v. Aavid Eng'g, Inc.*, 121 F.3d 691 (Fed. Cir. 1997)

7     (same).  This Court has previously granted summary judgment of invalidity under 35 U.S.C. § 305.

8     *See Sharper Image Corp. v. Neotec, Inc.*, 373 F. Supp. 2d 993, 996–98 (N.D. Cal. 2005) (Wilken,

9     J.), *appeal dismissed*, 171 Fed. Appx. 844 (Fed. Cir. Mar. 14, 2006).

10         Whether the scope of a claim has been impermissibly broadened during reexamination is a

11    matter of claim construction and thus a question of law for the Court.  *See Quantum*, 65 F.3d at

12    1580.  Under § 305, a claim is "broader in scope than the original claims if it contains within its

13    scope ***any*** conceivable apparatus or process which would not have infringed the original patent."  *In*

14    *re Freeman*, 30 F.3d 1459, 1464 (Fed. Cir. 1994).  Furthermore, "[a] claim that is broader in ***any***

15    respect is considered to be broader than the original claims even though it may be narrower in other

16    respects."  *Id.*

17         The Federal Circuit has specifically rejected the argument that ***adding*** language to a claim

18    necessarily ***narrows*** the claim; to the contrary, the added language can ***change*** the meaning of the

19    claim, and thus ***broaden*** the claim by encompassing an apparatus or method that previously could

20    not have infringed the original patent.  *See In re Freeman*, 30 F.3d at 1464–65 (holding that the

21    amendments during reexamination "attempt[ed] an end run" around a narrow claim construction).

22         Finally, if an independent claim has been impermissibly broadened during reexamination

23    (i.e., claim 1 of the '821 patent), then all the claims that depend from that independent claim (i.e.,

24    claims 2–4 of the '821 patent) have also been impermissibly broadened and must also be found

25    invalid under § 305.  *See, e.g.*, *Anderson v. Int'l Eng'g & Mfg., Inc.*, 160 F.3d 1345, 1350 (Fed. Cir.

26    1998) (invalidating dependent claims along with independent claim).

27

28

2.    **"revising _said data_ for said feature screen to indicate the available alternatives of the [first/second] subfamily": claim 9**

Kelora broadened claim 9 during reexamination in two ways:  First, it eliminated the requirement of "revising said feature screen" and instead claimed "revising **_said data_** for said feature screen."  Second, it changed the "revising" step from an action performed on the **_user_**'s computer to a different action performed by the **_server_** computer.  Although these changes narrowed the claim in one respect by adding limitations involving the server, these changes also **_broadened_** the claim in other respects by **_removing_** limitations involving the user's computer and the feature screen itself:  "[a] claim that is broader in **_any_** respect is considered to be broader than the original claims even though it may be narrower in other respects."  _In re Freeman_, 30 F.3d at 1464.

This invalidity argument turns on the proper constructions of "revising **_said feature screen_**" before the amendments and "revising **_said data_** for said feature screen" after the amendments made during reexamination.  The chart below reprints the relevant claim language and summarizes the parties' contentions.  _See_ Ex. 1, at 7–9 (summary of Defendants' contentions and supporting evidence); Ex. 22, Appx. B at 5–7 (Joint Claim Construction Statement).

| Claims 1–4[20] | Claim 9 | Term | Proposed Construction | |
|---|---|---|---|---|
| | | | **Defendants** | **Kelora** |
| (g) revising said feature screen to indicate the available alternatives of the first subfamily, | (g)  revising said data for said feature screen to indicate the available alternatives of the first subfamily and outputting said revised data for said feature | "revising **_said feature screen_** to indicate the available alternatives of the [first/second] subfamily" _as used in original claim 1_ | "revising[21] the **_feature screen on the display device of the user's computer_** to show all the available alternatives of the [first/second] subfamily" | The ordinary and customary meaning of this term is readily apparent, requiring no construction by the Court. |

---

[20] Additions to reexamined claims 1 and 9 (as compared to original claim 1) shown by underlining and deletions shown by ~~strikethrough~~

[21] In the Joint Claim Construction Statement, Defendants proposed the word "changing" rather than the word "revising," _see_ Ex. 22, Appx. B, at 5, 7 but this difference in wording is not material to the invalidity argument under § 305, so to focus the dispute on the key issue — which is **_who_** performs this step — Defendants are willing to use the word "revising" in the proposed construction, as Kelora appears to prefer.

| screen to said client computer via said computer network, | "revising *said data for* said feature screen to indicate the available alternatives of the [first/second] subfamily" *as used in amended claim 9* | "revising[22] the *data* used by the client computer to display the feature screen to provide all the available alternatives of the [first/second] subfamily" | |
|---|---|---|---|

There does not appear to be any dispute that "revising *said data*" has a different meaning than "revising *said feature screen*." That difference alone makes amended claim 9 invalid under § 305 because it is broader than any original claim by virtue of removing the limitation requiring revision of the feature screen.

There also does not appear to be any dispute that the step of "revising *said data*" in claim 9 is performed by the *server*. Claim 9 goes on to state that the revised data is "output[] . . . to said client computer via said computer network," which would only make sense if the revised data came from the *server*. Thus for purposes of invalidity under § 305, the only claim construction question is whether "revising *said feature screen*" in original claim 1 had to be performed by the *user's computer*. If so, then amended claim 9 is invalid under § 305 for a second, independent reason: it is broader than any original claim by virtue of eliminating a step that had to be performed by the user's computer.

The proper construction of "revising *said feature screen*" in the original claims is an action performed by the user's computer, not by the server, for at least the following reasons.[23]

***Claim language***: The use of different words in claims 1 and 9 suggests different meanings. This is known as the doctrine of claim differentiation: "Differences among claims can . . . be a useful guide in understanding the meaning of particular claim terms." *Phillips*, 415 F.3d at 1314. In particular, there does not appear to be any dispute that the phrase "revising *said data*" in claim 9

---

[22] *See supra* note 21.

[23] Additional evidence in support of Defendants' proposed construction is listed in Exhibit 1. Due to space limitations, not all supporting evidence is discussed in this brief.

refers to an act by the **server** , which suggests that the different words in claim 1 — "revising **said feature screen**" — refers to a different action, namely the action by the **user's computer** of revising what is displayed to the user.

**Specification**:  The specification confirms that "revising **said feature screen**" is an action performed by the user's computer (the "client"), not by the server.  Figures 26 to 29 are screenshots of the **user's computer** in the Internet embodiment, and according to the specification, "FIG. 27 is a feature screen **revised** from the feature screen of FIG. 26" and "FIG. 28 is a further **revision** of the feature screen of FIG. 27."  Ex. 2 at 5:8–:13.  The specification explains how these revisions are performed:  "The **server** 125 sends the **feature screen <u>status 127</u>**[24] **that has been updated** based on the modified selection criteria 14 to the client 126.  The **<u>client</u>** 126 receives the feature screen status 127 and **<u>displays</u> the updated <u>feature screen 9</u>**."  Ex. 2 at 19:8–:9.  Thus the **server** performs the act of revising the "**data**" (i.e., the feature screen status, which is item 127 in Figure 25), while the **client** performs the act of revising the **feature screen** (which is item 9 in Figures 7 and 26–29).  Again, that is the difference between claim 9 and claim 1.

**Prosecution history**:  The prosecution history of the '821 patent also supports the construction of "revising said feature screen" proposed by Defendants.  During reexamination, the Examiner repeatedly rejected claim 1 in light of the Granacki reference, and with respect to the limitation "revising said feature screen," the Examiner repeatedly pointed to the fact that Granacki teaches that "whenever a selection is made, **the screen changes**."  '821 Reexam, Ex. 4 at 4; *id.* Ex. 6 at 4; *id.* Ex. 14 at 7.  Thus, the Examiner interpreted "revising said feature screen" to refer to an action on the screen of the user's computer, which directly supports the construction proposed by Defendants.

**Inventor testimony**:  The inventor's testimony also confirms that "revising **said feature screen**" is an action — like "displaying" — that is performed by the user's computer:

---

[24] The "feature screen status" is the **data** a client computer uses to render the feature screen, as distinct from the **feature screen** itself:  "The feature screen status 127 comprises a feature screen code, ScreenNum 102 in a preferred embodiment, all features 5 appropriate to the feature screen 9 specified in ScreenNum 102, all available alternatives 7, all unavailable alternatives 8, and the selection criteria 14."  Ex. 2 at 18:50–:54.

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
Nos. 10-4947-CW, 11-1398-CW, 11-1548-CW, 11-2284-CW

A. . . . if you look at step G, *revising* said feature screen, *"revising" here obviously means displaying* . . . .

. . . .

Q. What does the term "*revising* said feature screen to indicate the available alternatives of the first subfamily," what does that mean?

A. It means modifying the feature screen to show the alternatives that are available in the subfamily that was the result of the first search based on the first selection.

. . . .

Q. — and you take a look at step 1 K, *revising* said feature screen to indicate the available alternatives of the second subfamily, what does that mean in the context of this example?

A. It means *displaying* to the user a second — a feature screen that indicates those available alternatives found in step J.

Ex. 11 at 274:16–:18, 278:23–279:4, 294:17–:23.

For all of these reasons, the *original* claims require the step of "revising said feature screen" to be performed by the *user's computer*, while amended claim 9 requires the step of "revising said data" to be performed by the server.  This means that claim 9 was impermissibly *broadened* during reexamination — and thus is invalid under § 305 — because it no longer includes a step that previously had to be performed by the user's computer.

### 3. "accepting a second selection criteria" and "selection criteria": claims 1–4 and 9

Kelora also broadened claims 1–4 and 9 during reexamination by changing the step of "accepting a second selection criteria" from an action performed by the *user* to an action performed by the *server*.  Although this change narrowed the claims in one respect by adding limitations involving the server, this change *broadened* the claims in another respect by *removing* limitations involving the user, and as explained before, "[a] claim that is broader in *any* respect is considered to be broader than the original claims even though it may be narrower in other respects."  *In re Freeman*, 30 F.3d at 1464.

This invalidity argument turns on the proper constructions of "accepting a second selection criteria" and "selection criteria" before and after the amendments made during reexamination.  The

-39-

1  chart below reprints the relevant claim language and summarizes the parties' contentions.  *See* Ex. 1,

2  at 6, 9–10 (summary of Defendants' contentions and supporting evidence); Ex. 22, Appx. B at 8–10

3  (Joint Claim Construction Statement).

| Claims 1–4[25] | Claim 9 | Term | Proposed Construction | |
|---|---|---|---|---|
| | | | **Defendants** | **Kelora** |
| (h)  accepting a second selection criteria ~~comprising~~ from the client computer via said computer network at said server wherein the second selection criteria comprises a resubmission to the server of the alternative or alternatives of the first selection criteria plus at least one alternative selected from the revised feature screen, | (h)  receiving and accepting a second selection criteria ~~comprising~~ from said client computer via said computer network, in which said second selection criteria comprises (1) a resubmission by said client computer of the alternative or alternatives of the first selection criteria ~~plus~~ along with (2) at least one alternative selected from the revised feature screen, | "accepting a second selection criteria" *as used in original claim 1* | "*an action performed by the user* on the client computer to initiate a search using the alternative(s) selected from the feature screen (e.g., when the user clicks on the "Search" button)" | The term "accepting" means: "accepting selection criteria for processing". The ordinary and customary meaning of the remainder of this term is readily apparent, requiring no construction by the Court. |
| | | "accepting a second selection criteria" *as used in amended claims 1 and claim 9* | *an action performed by the server* | |
| | | "selection criteria" | "selected alternative(s)" | "A signal including one or more alternatives to be used in search operations" |

21        There does not appear to be any dispute that step (h) in the *amended* claims is performed by

22  the *server*.  That is what the plain meaning of the amended claims requires, and Kelora has admitted

23  as much, *see* Ex. 37 at 19:8–:10 ("The amended claim . . . specifies that the 'accepting' selection

24  criteria take place on a server."); Ex. 39 at 21:3–:5 ("[T]here was an amendment made during re-

25  examination whereby it said the accepting has to take place at a server.")  The Court appears to agree

---

[25] Additions to reexamined claims 1 and 9 (as compared to original claim 1) shown by underlining and deletions shown by ~~strikethrough~~

with this conclusion:  "This 'second selection criteria,' in turn, is accepted by the server."  Ex. 40 at 8:4–:5.  Thus for purposes of invalidity under § 305, the only claim construction question is whether step (h) in the *original* claims must be performed by the *user* on a client computer.  If so, then the amended claims are invalid under § 305 because they are broader than the original claims by virtue of removing limitations concerning the user.

The proper construction of step (h) in the *original* claims requires the "accepting" step to be performed by a user on the client computer, not by a server, for at least the following reasons.[26]

***Claim language***:  The claim term "accepting" implies a choice made *by the user*, not an action by a server.  In particular, the user can either "accept" or "reject" his selection criteria, as explained in the next paragraph in more detail.

***Specification***:  The specification repeatedly indicates that the "accepting" step takes place on the *user*'s computer (e.g., when the user clicks on the "Search" button).  The act of "accepting" implies a *choice* of either "accepting" or "rejecting" the selection criteria.  There is no disclosure in the patent of any *computer* (whether the user's computer or a server computer) deciding whether to "accept" or "reject" the selection criteria; to the contrary, the patent discloses that the computer *always* performs a search on the selection criteria it receives.  The only decision whether to "accept" or "reject" the selection criteria is made by the *user*.  In particular, the user can select and deselect as many criteria (or alternatives) as the user desires.  After the user is satisfied with all his choices, he *accepts* the criteria he has selected (i.e., the "selection criteria") by clicking on the "search" button (208).  As shown in Figure 7 below, the "search" button 208 has a "check mark" on it, thus highlighting where the user must click to "accept" the criteria he has selected:

---

[26] Additional evidence in support of Defendants' proposed construction is listed in Exhibit 1. Due to space limitations, not all supporting evidence is discussed in this brief.

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
Nos. 10-4947-CW, 11-1398-CW, 11-1548-CW, 11-2284-CW

1

2

3

4

5

6

7

8

9



10

11

12

13

14

15     Positioning the interactive pointer 39 and clicking the mouse once,
toggles a radiobutton 23 or listbox entry 16 to *select* ("on") or *deselect*

16    ("off") an alternative 6.  While in the feature screen 9, ***the user*** may
***select*** and ***deselect*** turning radiobuttons 23 and listbox entries 16 "on"

17    and "off" as desired.  In response to a ***<u>user initiated signal</u>*** to perform
a search, the system retrieves information concerning which user

18    selectors 16, 23 are turned "on" and to which alternatives 6 the user
selectors 16, 23 that are turned "on" relate.  The alternatives 6 turned

19    "on" are the selected alternatives 37 and constitute the selection
criteria 14 used in the search to generate a subfamily 2.

20

        . . . .

21

        Erasure pushbutton 206 resets all currently selected alternatives

22    37. . . . ***Search pushbutton 208 performs a search according to the
selection criteria 14***.

23    Ex. 2 at 7:38–:49, 8:1–:5 & fig.7.

24    The AMP Navigator program (which this Court found was a reduction to practice of original

25    claim 1, *see* Ex. 26 at 11:9–:21) operates in the same way: a user can select and deselect as many

26    criteria (or alternatives) as the user desires.  After the user is satisfied with his choices, he ***accepts***

27    the criteria he has selected (i.e., the "selection criteria") by clicking on the "Search" button.  *See*

28

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
Nos. 10-4947-CW, 11-1398-CW, 11-1548-CW, 11-2284-CW

*supra* p. 7 (reprinting screenshots from Ex. 24).  The Court may run the AMP Navigator software for itself to verify this feature.  *See* Chandler Decl. ¶ 6 (explaining how to run the AMP Navigator software on a Windows computer).

　　　　*Prosecution history*:  The prosecution history of the '821 patent also confirms the construction of the "accepting" step proposed by Defendants.  In the Examiner's initial rejection of original claim 1, the Examiner concluded that U.S. Patent No. 5,544,360 to Lewak "teaches a system comprising the steps of . . . '*accepting*' (col. 10, lines 41–47)."  '821 Prosecution, No. 3, at 3.  The cited portion of Lewak states:

> The *user* initiates definition of a search filter by, for example, *clicking the mouse* on a "Set Categories" button.  The *user* then *selects* the pre-defined category descriptions for the files which the user wants to find.  In the illustrated embodiment, this is done in the same way as when categorizing a file: the *user clicks the mouse* on each applicable category description.

Ex. 10 at 10:41–:47.[27]  Not coincidentally, this disclosure by Lewak is essentially the same as the disclosure in the '821 patent with respect to how a user initiates a search.  Thus, the Examiner interpreted "accepting" to mean the user initiates a search by clicking with his mouse, which directly supports the construction proposed by Defendants.

　　　　The applicants *never* disagreed with the Examiner's interpretation of "accepting."  *See* '821 Prosecution, No. 5, at 4–6.  This is significant because "[s]tatements about a claim term made by an examiner during prosecution of an application may be evidence of how one of skill in the art understood the term at the time the application was filed."  *Boston Scientific Corp. v. Johnson & Johnson*, No. 02-790, 2006 WL 6221554, at *8 (N.D. Cal. Sept. 19, 2006) (Illston, J.) (internal quotation marks omitted).  If the applicants believed that "accepting" was an action performed by the *server*, then they should have said so during prosecution.  *See, e.g.*, *Fuji Photo Film Co. v. ITC*, 386

---

[27] Because Lewak was cited during prosecution, Lewak is *intrinsic* evidence (just like the specification and prosecution history of the '821 patent):  "This court has established that 'prior art cited in a patent or cited in the prosecution history of the patent constitutes intrinsic evidence.'"  *V-Formation, Inc. v. Benetton Group SpA*, 401 F.3d 1307, 1311 (Fed. Cir. 2005).  Accordingly, Lewak's teachings regarding what constitutes "accepting" should be considered — along with the specification and prosecution history — in construing step (h) in the '821 patent.

1    F.3d 1095, 1100 (Fed. Cir. 2004) (holding that applicant's acquiescence in Examiner's interpretation

2    of claim limitation supported claim construction consistent with that interpretation).

3            Similarly, during reexamination of the '821 patent, the Examiner repeatedly found that the

4    "accepting" step was anticipated by the Granacki reference, which teaches that "[t]he ***user*** can

5    restrict the list of components at any time by ***selecting*** an entry in any column." '821 Reexam, Ex.

6    4, at 4 (initial rejection); *id.* Ex. 6, at 4 (final rejection); *id.* Ex. 14, at 6 (brief on appeal).  Thus once

7    again, the Examiner interpreted "accepting" to mean an action performed by the ***user***, which again

8    directly supports the construction proposed by Defendants:  "Because an examiner in reexamination

9    can be considered one of ordinary skill in the art, his construction of the asserted claims carries

10   ***significant weight***."  *St. Clair Intellectual Prop. Consultants, Inc. v. Canon Inc.*, 412 Fed. Appx.

11   270, at 276 (Fed. Cir. Jan. 10, 2011).  Rather than challenge the Examiner's claim construction, the

12   applicants amended the claims to overcome the rejection, thus conceding that the Examiner was

13   correct.  *See* '821 Reexam, Ex. 15, at KS0000454 (amending claims "to avoid lengthy appeal

14   proceedings").

15           ***"selection criteria"***:  In anticipation of the arguments above, Kelora has proposed a

16   construction for "selection criteria" to support its theory that the selection criteria is "accepted" by

17   the server, not by the user.  Kelora's proposed construction for "selection criteria" is:  "A ***signal***

18   including one or more alternatives to be used in search operations."  Kelora's proposed construction

19   is incorrect because it is inconsistent with the intrinsic evidence, which makes clear that the

20   "selection criteria" is simply the "***selected alternative(s)***."  Indeed, this definition comes straight out

21   of the patent:  "The current selection criteria 14 is ***defined*** as the set of selected alternatives . . . ."

22   Ex. 2 at 15:67–16:1.  The Federal Circuit has held that "the patentee must be bound by [such an]

23   express definition" in the patent.  *Sinorgchem Co. v. ITC*, 511 F.3d 1132, 1136 (Fed. Cir. 2007).

24   Figures 8 and 28 show that item 14 (the "selection criteria") is simply the alternative(s) selected by

25   the user — not a "signal" being sent to the server as advocated by Kelora.  *See supra* pp. 8,

26   10 (reprinting Figures 8 and 28).

27           For all of these reasons, step (h) in the ***original*** claims requires the "accepting" step to be

28   performed by a user on the client computer, while step (h) in the ***amended*** claims requires the

1    "accepting" step to be performed by the server, meaning that claims 1–4 and 9 were impermissibly

2    *broadened* during reexamination — and thus are invalid under § 305 — because they no longer

3    include the limitations in step (h) involving the user.

4           C.      **Non-infringement: claims 1–4 and 9 requires steps that are not**
                    **performed by Defendants' websites**
5

6           If the Court invalidates claims 1–4 and 9, then it may enter judgment without addressing non-

7    infringement.  *See* Ex. 26 at 13:16–:21.  But if the Court does ***not*** invalidate claims 1–4 and 9, then

8    the Court should grant summary judgment of non-infringement because those claims all have a

9    "divided infringement" problem.  In particular, Defendants' websites do not perform at least the

10   steps of "displaying," "revising said feature screen," and "resubmission to the server" if those

11   limitations are properly construed, as discussed below.

12          1.      **Legal standards for divided infringement**

13          In general, "[d]irect infringement requires a party to perform or use ***each and every step*** or

14   element of a claimed method or product," so if some steps are performed by one party, and other

15   steps are performed by an unrelated party, then there cannot be direct infringement under 35 U.S.C.

16   § 271(a) as a matter of law.  *BMC Res., Inc. v. Paymentech, L.P.*, 498 F.3d 1373, 1378 (Fed. Cir.

17   2007) (affirming summary judgment of non-infringement); *accord Muniauction, Inc. v. Thomson*

18   *Corp.*, 532 F.3d 1318, 1328–30 (Fed. Cir. 2008) (finding non-infringement as a matter of law), *cert.*

19   *denied*, 129 S. Ct. 1585 (2009); *PA Advisors, LLC v. Google, Inc.*, 706 F. Supp. 2d 739, 747–48

20   (E.D. Tex. 2010) (Rader, C.J.) (finding accused websites non-infringing given claim language that

21   required certain steps to be performed at the client computer); *Keithley v. The Homestore.com, Inc.*,

22   636 F. Supp. 2d 978, 980–85 (N.D. Cal. 2008) (Illston, J.) (granting summary judgment of non-

23   infringement).[28]

24

25          [28] The Federal Circuit will rehear en banc two recent cases concerning divided infringement.  *See*

26   *McKesson Techs. Inc. v. Epic Sys. Corp.*, No. 2010-1291, 2011 WL 2173401 (Fed. Cir. May 26,
     2011) (en banc); *Akamai Techs., Inc. v.MIT*, No. 2009-1372, 419 Fed. Appx. 989 (Fed. Cir. Apr. 20,

27   2011) (en banc).  Defendants' divided infringement arguments do not rely upon these newer cases,
     however, and instead rely upon the Federal Circuit's long-standing jurisprudence in this area.

28

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
Nos. 10-4947-CW, 11-1398-CW, 11-1548-CW, 11-2284-CW

1    Furthermore, "absent direct infringement of the claims of a patent [under § 271(a)], there can

2    be neither contributory infringement [under § 271(c)] nor inducement of infringement [under

3    § 271(b)]." *Dynacore Holdings Corp. v. U.S. Philips Corp.*, 363 F.3d 1263, 1277 (Fed. Cir. 2004)

4    (affirming summary judgment of non-infringement); *see also, e.g.*, *Global Patent Holdings, LLC v.*

5    *Panthers BRHC LLC*, 586 F. Supp. 2d 1331, 1335 (S.D. Fla. 2008) (dismissing claims under

6    § 271(b) and (c) because "Plaintiff has not sufficiently alleged a predicate finding of direct

7    infringement" under the holdings of *BMC* and *Muniauction*), *aff'd*, 318 Fed. Appx. 908 (Fed. Cir.

8    Apr. 1, 2009) (per curiam).

9    Finally, "[a] conclusion of noninfringement as to the independent claims [e.g., claim 1 of the

10   '821 patent] requires a conclusion of noninfringement as to the dependent claims [e.g., claims 2–4 of

11   the '821 patent]." *Muniauction*, 532 F.3d at 1328 n.5; *see also* 35 U.S.C. § 112, ¶ 4.

12   In short, if there is ***any*** step of independent claims 1 and 9 of the '821 patent that is not

13   performed by Defendants' websites, then Defendants do not infringe any of claims 1–4 or 9 of the

14   '821 patent under § 271(a), (b), or (c).

15        **2.    "displaying": claims 1–4 and 9**

16   Perhaps the most obvious step of the claims ***not*** performed by Defendants' websites is the

17   "displaying" step in claims 1–4 and 9, which is performed by the user's computer.  In Case

18   No. 09-811, the parties ***agreed*** that the proper construction of "displaying" was "showing on the

19   display device of the user's computer," *see* Ex. 21, Ex. A at 2, and thus eBay and Microsoft moved

20   for summary judgment of non-infringement that their websites did not perform the "displaying" step,

21   *see* Ex. 23 at 13:4–20:21.  Ultimately this Court never decided the issue because it invalidated the

22   claims instead. *See supra* Part III.F, p. 11.  The same arguments apply in this case, however, and

23   thus summary judgment of non-infringement should be granted if the Court does not invalidate the

24   claims again.  Indeed, Kelora has completely disavowed the construction of "displaying" that was

25   agreed-upon in the previous litigation (and which has been proposed again by Defendants in this

26   action), which underscores that Kelora recognizes that there cannot be infringement under that

27   construction.

28

1      The chart below reprints the relevant claim language and summarizes the parties'

2  contentions.  *See* Ex. 1, at 3–4 (summary of Defendants' contentions and supporting evidence); Ex.

3  22, Appx. B at 3–5 (Joint Claim Construction Statement).

| Claims 1–4[29] | Claim 9 | Term | Proposed Construction | |
|---|---|---|---|---|
| | | | Defendants | Kelora |
| (c) displaying a feature screen indicating said alternatives represented in the family, | (c)  displaying a feature screen indicating said alternatives represented in the family, <u>wherein data is output to a client computer via said computer network,</u> | "displaying [a feature screen / at least one grouping]" | "showing on the display device of the user's computer [a feature screen/at least one grouping]" | The term "displaying" means: "The action of sending a page to a display surface or device for viewing." The ordinary and customary meaning of the remainder of this term is readily apparent, requiring no construction by the Court. |

16     The proper construction of "displaying" requires that step to be performed by the user's

17  computer, not by a server (such as Defendants' websites), for at least the following reasons.[30]

18     ***Claim language***:  The plain and ordinary meaning of "displaying" supports Defendants'

19  proposed construction of "***showing*** on the display device of the user's computer," and is inconsistent

20  with Kelora's litigation-inspired proposal of "***sending*** a page to a display surface or device for

21  viewing."  In short, "displaying" is not "sending."  Indeed, if Kelora's proposed construction were

22  correct, then it would render superfluous the amendment made to claim 9 "wherein data is ***output*** to

23  a client computer via said computer network."  The Federal Circuit has held that a construction that

24  would render limitations superfluous should be avoided:  "A claim construction that gives meaning

---

[29] Additions to reexamined claims 1 and 9 (as compared to original claim 1) shown by <u>underlining</u> and deletions shown by ~~strikethrough~~

[30] Additional evidence in support of Defendants' proposed construction is listed in Exhibit 1. Due to space limitations, not all supporting evidence is discussed in this brief.

1    to all the terms of the claim is preferred over one that does not do so." *Merck & Co. v. Teva Pharms.*

2    *USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005).

3         ***Specification***:  The specification explicitly states that the "feature screen" is displayed by the

4    client, not the server:  "The ***client*** 126 receives the feature screen status 127 and ***displays*** the updated

5    ***feature screen*** 9."  Ex. 2 at 19:8–:10.  By way of contrast, the specification shows that the act of

6    "sending" — which is the act Kelora focuses on — is an action performed by the server with respect

7    to the "feature screen ***status***," not the "feature screen" itself:  "The ***server*** 125 sends the ***feature***

8    ***screen*** <u>***status***</u> 127 that has been updated based on the modified selection criteria 14 to the client

9    126."  Ex. 2 at 19:6–:8; *see also id.* fig.25.  In short, the server sends the "feature screen ***status***"

10   while the ***client*** performs the act of "displaying" the "***feature screen***."  The claim language in

11   question is "displaying a ***feature screen***," and thus the specification makes clear that this act is

12   performed by the client, not the server.

13        ***Prosecution history***:  If the applicants had intended the claim to require "sending" or

14   "outputting" — rather than "displaying" — then they easily could have written the claims to use

15   those words.  In fact, during reexamination of the '821 patent, the applicants proposed a new claim 9

16   in which the step of "displaying" was replaced with the step of "outputting data for a feature screen."

17   *See* '821 Reexam, Ex. 8, at 5 (proposing new claim 9, step (c)).  In the end, however, the applicants

18   did ***not*** implement this amendment and instead reverted to the original "displaying" language, *see*

19   '821 Reexam, Ex. 15, at KS0000452, which confirms that the applicants knew how to use words like

20   "outputting" but deliberately chose ***not*** to do so.[31]  It would be a mistake to now construe the claims

21   to cover what the applicants explicitly chose not to claim.

22        ***Inventor testimony***:  The first-named inventor of the '821 patent agrees that the "displaying"

23   step is performed by the user's computer, not the server:

24              Q.  Does the browser process HTML code that it receives from a
                server?
25

---

26   [31] Indeed, had the applicants changed the claims during reexamination from "displaying" (an
     action performed by the client computer) to "outputting" (an action performed by the server), that
27   would have broadened the claims, making them invalid under § 305, *cf. supra* Part V.B, pp. 34–45,
     which may explain why the applicants ultimately did ***not*** change "displaying" to "outputting."
28

1      A.  Yes.

2      Q.  What does it do when it processes the HTML code?

3      A.  It formats the text.

4      Q.  Okay.  And after it formats the text, what does it do?

5      A.  Puts it on the screen.

6      Q.  What do you mean it "puts it on the screen"?

7      A.  ***Displays*** it on the screen.

8      . . . .

9      Q.  ***Is there any teaching of <u>displaying</u> on the <u>server</u>*** in column 18
       or 19 [of the '821 patent]?

10

11     A.  Displaying on the server?

12     Q.  Yes.

13     A.  ***The <u>display</u>, if I recall, is a display that happens on the user
       of the — on the browser of the <u>client</u>***.

14     Ex. 11 at 124:11–:21, 129:23–130:4.

15         ***Previously agreed-upon construction***:  Finally, it is noteworthy that in Case No. 09-811, six

16     different parties — including the previous owner of the '821 patent — all agreed that the proper

17     construction of "displaying" is "showing on the display device of the user's computer."  Ex. 21, Ex.

18     A at 2.  Kelora's refusal to agree to such a non-controversial construction is telling:  Kelora knows

19     that under this construction, Defendants do not infringe.

20         For all of these reasons, "displaying" is an action performed by the user's computer, not the

21     server, and thus Defendants' websites cannot infringe claims 1–4 or 9 of the '821 patent.

22         **3.      <u>"revising said feature screen to indicate the available
              alternatives of the [first/second] subfamily": claims 1–4</u>**

23         Another step that Defendants' websites do ***not*** perform is the step of "revising said feature

24     screen" in claims 1–4.  This step, like the step of "displaying a feature screen" discussed directly

25     above, is performed by the user's computer.  The arguments in support of Defendants' proposed

26     construction for "revising said feature screen" were presented above in Part V.B.2, pp. 36–39.

27

28

-49-

4. **"resubmission to the server" / "resubmission by said client computer": claims 1–4, 9**

A third step that Defendants' websites do **not** perform is the step of "resubmission to the server" in claims 1–4 and the step of "resubmission by said client" in claim 9. Again these steps are performed by the user's computer, not the server. The chart below reprints the relevant claim language and summarizes the parties' contentions. *See* Ex. 1, at 10 (summary of Defendants' contentions and supporting evidence); Ex. 22, Appx. B at 10 (Joint Claim Construction Statement).

| Claims 1–4[32] | Claim 9 | Term | Proposed Construction | |
|---|---|---|---|---|
| | | | **Defendants** | **Kelora** |
| (h) accepting a second selection criteria ~~comprising~~ from the client computer via said computer network at said server wherein the second selection criteria comprises a ***resubmission to the server*** of the alternative or alternatives of the first selection criteria plus at least one alternative selected from the revised feature screen, | (h) <u>receiving and</u> accepting a second selection criteria ~~comprising~~ from <u>said client computer via said computer network, in which said second selection criteria comprises (1) a resubmission by said client computer of</u> the alternative or alternatives of the first selection criteria ~~plus~~ <u>along with (2)</u> at least one alternative selected from the revised feature screen, | "resubmission to the server" in amended claim 1 | "resubmission by said client computer to the server" | The ordinary and customary meaning of this term is readily apparent, requiring no construction by the Court. |

Neither side has proposed for construction — and thus neither side appears to dispute the meaning of — the phrase "resubmission by said client" in claim 9. It means what it says: the client resubmits information to the server. Claim 1, however, uses slightly different language — "resubmission to the server" — and thus to avoid any doubt, Defendants have proposed this phrase

---

[32] Additions to reexamined claims 1 and 9 (as compared to original claim 1) shown by <u>underlining</u> and deletions shown by ~~strikethrough~~

1    for construction to confirm that it also requires the **client** to perform the act of resubmitting

2    information to the server.  This proposed construction is directly supported by the specification:

3    "The **client** 126 sends to the server 125 . . . the modified selection criteria 14."  Ex. 2 at 18:67–19:2.

4    It is also supported by the applicants' representation during reexamination that "[t]he amendment of

5    claim 1 presented herein adjusts the claim language of claim 1 to **correspond** to that of allowed

6    claim 9," *see* '821 Reexam, Ex. 15, at KS0000454, and the statement by the Examiner in allowing

7    the reexamined claims:  "Amended claim 1 and new claim 9 are limited to a search query being

8    **submitted by a <u>client</u>** computer via a network, wherein the search is performed at a server. . . . In

9    other words, when the **client** computer of claims 1 or 9 **submits** a second query, it transmits both the

10   previous and current selection criteria together."  '821 Reexam, Ex. 16, at 3.

11                              *     *     *     *     *

12          For the reasons above, Defendants' websites do not perform the steps of "displaying,"

13   "revising said feature screen," and "resubmission to the server," and thus summary judgment of non-

14   infringement should be granted on the basis of any of those three terms.

15          **D.     <u>Non-infringement:  claims 1, 2, 4, and 9 require steps that are not
                     performed by Nebraska Furniture Mart, Cabela's, and Newegg</u>**

16

17          Kelora's claims suffer from an additional divided infringement problem with respect to

18   Nebraska Furniture Mart ("NFM"), Cabela's, and Newegg, because these defendants' websites do

19   not even provide the core search functionality of the claims.  Instead, that functionality is provided

20   by a third party, Endeca.  *See* Larson Decl. ¶¶ 5–7.  These Endeca Users do not direct or control how

21   Endeca's software performs the search function.[33]  *Id.*  To the contrary, Endeca's search technology

22   is highly proprietary.  *See id.* ¶ 9.  Under governing Federal Circuit law, the Endeca Users cannot be

23   liable for infringement.

24          When steps of a method claim are performed by multiple parties, as is the case with the

25   Endeca Users' search functionality, the claim is directly infringed only if one party exercises

26   "control or direction" over the entire method.  *BMC*, 498 F.3d at 1380.  The requisite level of

27   ───────────────────
     [33] As used in this brief, the term "Endeca Users" refers to NFM, Cabela's, and Newegg.

28

"control or direction" is met in circumstances in which "the law would traditionally hold the direct accused infringer vicariously liable for the acts committed by another party," *Muniauction*, 532 F.3d at 1330, such as where one party is the agent for the accused infringer under traditional agency principles.  This standard is *not* satisfied merely because a third party provides services for a customer, whether an individual or a corporation.  *See, e.g.*, *BMC*, 498 F.3d at 1375 (no vicarious liability where third party vendor processed financial transactions for merchants).  Rather, the accused infringer must "control or direct each step of the patented process."  *Id.* at 1380.

Here, NFM, Cabela's and Newegg are merely users of Endeca's software.  They do not direct or control the steps performed by that software.  Accordingly, they are no more liable for infringement than an individual user of Google Search if Google's technology were accused of infringement.  As explained below, these Endeca Users do not perform the steps of at least "determining available alternatives," providing the "computer readable data file of stored information," "reading said data file," "accepting a second selection criteria," or "determining a . . . subfamily of items."

### 1.      <u>"determining the available alternatives"</u>

Independent claims 1 and 9 require "determining available alternatives," which all the parties in the prior litigation had agreed means "identifying those alternatives that remain available for further selection."  Ex. 21, Ex. B at 7 (steps (f) and (j)).  Although Kelora now retreats from this construction, it is clear that the step of "determining available alternatives" requires the server computer to determine/identify which search criteria ("alternatives") remain relevant for the subfamily of items narrowed through earlier searches.  *See* '821 Patent, Ex. 2 at 8:14–:16 ("The system then searches the subfamily 2 to identify those alternatives 6 that remain available for further selection . . . .")  Indeed, the patent touts this step as a critical aspect of the invention:  "[T]here is a need for a search method that provides information interactively as to how certain alternative selections affect the number of remaining alternatives . . . ."  *Id.* at 3:13–:16.

The Endeca Users neither perform any search nor determine the alternatives available following a search.  Rather, they simply pass the user's search request to Endeca and relay the search

1    results, including the still available criteria, back to the user's computer.  *See* Larson Decl. ¶¶ 7, 13.

2    How the Endeca software determines the search results is not controlled or directed by them.

3                    **2.      "providing a computer readable data file of stored**
                             **information"/"reading said data file"**
4

5            Nor do the Endeca Users "provide" or "read" the "computer readable data file of stored

6    information" of step (a) in claims 1 and 9.  The data file of the claims contains the information that is

7    searched.  *See* Ex. 1, claims 1 and 9, step (a).  In the claimed method, the server reads this data file in

8    step (b) to perform searches.

9            The claim language's reference to "stored information" reflects that the "data file" is

10   preserved in a static storage device.  *See, e.g.*, *McGraw-Hill Dictionary of Scientific and Technical*

11   *Terms* 1927 (5th ed. 1994) (defining "store" as "To record data into a (static) data storage device.

12   To preserve data in a storage device."), *available at* Ex. 18.  This is consistent with the

13   specification's description of the data file as being stored on the server's hard disk (a non-volatile

14   storage medium).  Ex. 2, at 18:11–:17.  It is also consistent with Kelora's admission in its opposition

15   to Microsoft and eBay's earlier summary judgment motion that, "in the Internet embodiment [of its

16   purported invention], the program and data files all reside on a server," and that these server-stored

17   "files . . . are responsible for the steps in the claimed methods."  Ex. 37, at 21:11–:13.  Consistent

18   with the intrinsic evidence and Kelora's admissions, Defendants have proposed that this phrase be

19   construed to mean "a collection of data — text, numbers, or graphics — in a non-volatile storage

20   medium which can be read by a computer."  *See* Ex. 1, at 1–2.

21           Under the foregoing construction, the Endeca Users' accused websites do not practice the

22   "providing" or "reading" steps of the claims.  *See* Larson Decl. ¶¶ 8–10.  Endeca's software builds

23   an index of information stored by Endeca.  *See id.* ¶ 9.  Using this index, Endeca identifies the

24   products and attributes that satisfy the end user's search criteria, and delivers the results back to the

25   Endeca User's web servers for transmission to the client.  *See* Larson Decl. ¶¶ 6–10.  The Endeca

26   User's web servers, however, neither "provide" nor "read" a database as required by the claims.

27

28

### 3. **"accepting a second selection criteria"**

The Endeca Users also do not "accept[] a second selection criteria," as required by step (h) in amended claims 1 and 9. As discussed above in Part V.B.3, pp. 39–45, during re-examination, Kelora sought to change the meaning of this phrase from an action performed by the user to an action performed by the server. In doing so, Kelora amended the claim to recite "receiving *and* accepting a second selection criteria from said client computer via said computer network." (emphasis added). The re-examination history reflects that Kelora used the "accepting" term to indicate that the server utilized the selection criteria as an input ***to perform a search***. In distinguishing its invention from the Granacki reference discussed earlier, Kelora emphasized that, "[u]nder the claimed method, . . . . ***when the latest or 'second selection criteria' is*** <u>***accepted***</u>***, the webserver executes a corresponding search***. . . ." '821 Reexam, Ex. 5, at 11.

Again, for the reasons already stated, the Endeca Users do not utilize any selection criteria to ***perform*** a search. They merely pass search criteria to the Endeca software, and thus do not perform this step of the method. *See* Larson Decl. ¶¶ 14–15.

### 4. **"determining a [first/second] subfamily"**

Lastly, the Endeca Users do not perform the step of "determining a [first/second] subfamily of items of the family, wherein each item in the [first/second] subfamily satisfies said [first/second] selection criteria." *See* Ex. 1, claims 1 and 9, steps (e) and (i). Regardless of whether the phrase "determining a [first/second] subfamily" is construed consistent with the construction to which all the parties agreed in prior litigation — "searching for items that match the selection criteria" — or left as is, once again the Endeca Users do not perform the specified action. The Endeca software "searches for" and "determines" the items that match the user's search criteria using proprietary algorithms. *See* Larson Decl. ¶¶ 7, 11–12. The Endeca Users do not perform this step, nor do they have direction or control over Endeca's search process. *See id.*

\*     \*     \*     \*     \*

In sum, the Endeca Users do not direct or control each step of the claimed method and therefore cannot be held liable for infringement.

**E.    Claim construction:  the preamble does *not* limit claims 1–4 and 9 to *only* a web server**

None of the invalidity and non-infringement arguments discussed above turn on the proper construction of the preambles to independent claims 1 and 9, but to the extent the Court construes those preambles, they should not be construed in the overly narrow manner proposed by Kelora. The chart below reprints the relevant claim language and summarizes the parties' contentions.  *See* Ex. 1, at 1 (summary of Defendants' contentions and supporting evidence); Ex. 22, Appx. B at 2 (Joint Claim Construction Statement).

| Claims 1–4[34] | Claim 9 | Term | Proposed Construction | |
|---|---|---|---|---|
| | | | **Defendants** | **Kelora** |
| 1.  A method for assisting a user in identifying a subfamily of items within a family of items <u>said method performed with a server connected to a client computer through a computer network,</u> comprising the steps of: | 9.  A method for assisting a user in identifying a subfamily of items within a family of items, <u>the method comprising the following steps</u> ~~of~~ <u>which are performed with a server connected to a computer network</u>: | preamble | The preamble limits the claim, and "user" means a person using a computer | "Server connected to a client computer through a computer network" means "Server computer connected via the Internet to a client computer running a Mosaic compatible browser." |

Properly construed, the "computer network" recited in the preamble need not be a specific computer network, such as the Internet, and the "client computer" need not be a computer running a specific type of software, such as a Mosaic compatible browser.  Nothing in the claims requires the specific limitations proposed by Kelora.  Similarly, nothing in the specification or prosecution history requires these limitations.  As such, the phrase "server connected to a client computer

---

[34] Additions to reexamined claims 1 and 9 (as compared to original claim 1) shown by <u>underlining</u> and deletions shown by ~~strikethrough~~

1    through a computer network" should not be limited to any particular computer network or any

2    particular client computer running particular software.

3         The section of the specification that Kelora relies on for its proposed construction describes

4    "***an embodiment*** of the invention in an Internet environment."  Ex. 2 at 18:11–:12.  It would be

5    legally erroneous to limit the claims to all the specific features of the Internet embodiment disclosed

6    in the specification:  "[A]lthough the specification often describes very specific embodiments of the

7    invention, we have repeatedly warned against confining the claims to those embodiments."  *Phillips*,

8    415 F.3d at 1323.  Indeed, the specification goes on to describe specific details associated with the

9    Internet embodiment, such as a client computer "having a minimum of 4 Mbytes of RAM and an

10   Intel 80386 processor running Microsoft Windows 3.1," and "a Mosaic compatible browser."  Ex. 2

11   at 18:26–:31.  Kelora selectively picks one particular element of this embodiment that it believes

12   should be read into the claims, but ignores the others.  To accept Kelora's argument that the "client

13   computer" of claims 1 and 9 must be limited to computers running a Mosaic compatible browser

14   would also require limiting the claims to an Intel 80386 processor running Microsoft Windows 3.1.

15   Neither is correct; the claims are not limited to any particular embodiment disclosed in the

16   specification.

17        Similarly, there is no reason why the "network" of the claims should be limited to the

18   particular network known as the Internet.  At the time of filing, many types of computer networks

19   were well known — including the Internet — and there is no indication from the specification or

20   prosecution history why any of these other networks would be outside the scope of the "computer

21   network" recited in the claims.  Indeed, during prosecution of the '444 patent (the grandparent to the

22   patent-in-suit), the Examiner took "official notice that client server systems are ***well known*** in the

23   art."  '444 Prosecution, No. 7, ¶ 28.  Furthermore, the parent to the '821 patent shows that the

24   applicants knew how to add "HTML" limitations when they intended to limit the claims to a

25   particular network, such as the Internet.  *See* Ex. 5, claims 3 & 5.  Neither "Internet" nor "HTML"

26   can be found in the language of the asserted claims, however, and they should not be added through

27   claim construction.

28

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
Nos. 10-4947-CW, 11-1398-CW, 11-1548-CW, 11-2284-CW

For all of these reasons, the preambles of claim 1 and 9 do not limit those claims to either the Internet or a client running a Mosaic compatible browser.

### F.   Claim construction for remaining terms

The sections below address the proper construction for the remaining terms where there is a dispute between the parties.  For all of these terms, Kelora has proposed that the "plain and ordinary meaning" of the terms applies, and thus no construction is necessary.  *See generally* Ex. 22.  To the contrary, even if a term would have a "plain and ordinary meaning" ***to a person of ordinary skill*** (after reviewing all of the intrinsic record), that does not mean that the term would have any particular meaning ***to the jury*** (who will not be reviewing all of the intrinsic record).  The point of claim construction is for the Court to instruct the jury on the meaning of the claims; it would be inappropriate to leave it up to the jury to try to figure out on its own what the terms below mean. *See, e.g.*, *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1361–63 (Fed. Cir. 2008) (vacating and remanding because district court failed to construe the term "only if").

### 1.   "said alternatives represented in the family"

The chart below reprints the relevant claim language and summarizes the parties' contentions.  *See* Ex. 1, at 4–5 (summary of Defendants' contentions and supporting evidence); Ex. 22, Appx. B at 10–11 (Joint Claim Construction Statement).

| Claims 1–4, 9 | Term | Proposed Construction | |
|---|---|---|---|
| | | **Defendants** | **Kelora** |
| (a) providing a computer readable data file of stored information representing at least one family of items, said data file identifying ***at least one alternative for each item***, . . . . <br><br>(c) displaying a feature screen indicating ***said alternatives*** represented in the family . . . . | "said alternatives" | "all the alternatives from the data file for the family of items" | The ordinary and customary meaning of this term is readily apparent, requiring no construction by the Court. |

Kelora's proposed construction is inadequate because it does not tell the jury whether "said alternatives" refers to ***some*** alternatives, or ***all*** the alternatives from the family of items.  The proper construction is "all" the alternatives from the family of items, for two reasons:  First, the antecedent

basis for "said alternatives" is the "alternatives" described in step (a), which is referring to the alternatives for *all* the items in the family of items.  Indeed, the goal of the invention is to answer the question, "How does the selection of one alternative affect my remaining alternatives?," Ex. 2 at 4:1–:2, and that goal would be frustrated if the feature screen did not display *all* the alternatives. Second, during prosecution, the applicants distinguished the prior art on the basis of this claim language by arguing that "[in the prior art] there are no teachings suggesting a display of *all* of this information on a single screen. . . . [T]here is no suggestion or teaching of how one would arrange *all* of the alternatives information on the screen . . . ." '444 Prosecution, No. 4, at 18.  This argument confirms that the applicants regarded this claim language as referring to *all* the alternatives from the family of items.

## 2.    Terms whose construction was previously agreed-upon

For the terms listed below, Defendants are proposing the exact same construction that was *agreed-upon* by six different parties — including the previous owner of the '821 patent — in Case No. 09-811.  *See* Ex. 21, Ex. A.  Remarkably, Kelora now disputes these constructions.  These constructions are directly supported by the specification of the patent, as shown by the "Exemplary Evidence" column in the tables below.  Additional evidence in support of the constructions below is listed in Exhibit 1.

### a.    "family of items"

| Defendants' Proposed Construction | Exemplary Evidence |
| --- | --- |
| "a collection of [items] with specific qualifiers and/or attributes, where one would want to identify [items] by specifying its qualifiers and/or attributes" | "It is apparent, therefore, that '*family*' as used herein is broadly defined as a collection of offerings with specific qualifiers and/or attributes, where one would want to identify an offering by specifying its qualifiers and/or attributes."  Ex. 2 at 5:43–:47. |

b.   **"subfamily of items"**

| Defendants'<br>Proposed Construction | Exemplary Evidence |
|---|---|
| "a collection of [items] from the family with at least one matching qualifier and/or attribute" | "Using the selection criteria 14, the system searches the family 1 for items 3 that satisfy the selection criteria 14.  A result of the search is a **subfamily** 2 of items, each item 3 within the **subfamily** 2 having alternatives 6 that match the selection criteria 14."  Ex. 2 at 8:9–:14. |

c.   **"alternative for each item"**

| Defendants'<br>Proposed Construction | Exemplary Evidence |
|---|---|
| "a qualifier and/or attribute" | "A family of items 1 could be any commercial product or service offering with a common set of features 5 and **alternatives** 6, associated therewith."  *Id.* at 5:34–:36. |
| | "It is apparent, therefore, that 'family' as used herein is broadly defined as a collection of offerings with specific **qualifiers and/or attributes**, where one would want to identify an offering by specifying its **qualifiers and/or attributes**."  *Id.* at 5:43–:47. |

d.   **"feature screen"**

| Defendants'<br>Proposed Construction | Exemplary Evidence |
|---|---|
| "an image showing multiple alternatives within a family or subfamily" | "The **feature screen** 9, as shown in FIGS. 7 through 9, provides a display of a series of groupings 13 associated with the selected family 1.  Each grouping 13 comprises one of the features 5 and a plurality of respective alternatives 6, each feature 5 and respective alternatives being represented within the family 1."  Ex. 2 at 7:11–:16. |

e.   **"determining a [first/second] subfamily"**

| Defendants'<br>Proposed Construction | Exemplary Evidence |
|---|---|
| "searching for items that match the selection criteria" | "Using the selection criteria 14, the system **searches** the family 1 for items 3 that satisfy the selection criteria 14.  A result of the search is a subfamily 2 of items, each item 3 within the subfamily 2 having alternatives 6 that **match** the selection criteria 14."  Ex. 2 at 8:9–:14. |

f.   **"determining available alternatives"**

| Defendants' Proposed Construction | Exemplary Evidence |
|---|---|
| "identifying those alternatives that remain available for further selection" | "A result of the search is a subfamily 2 of items, each item 3 within the subfamily 2 having alternatives 6 that match the selection criteria 14.  The system then searches the subfamily 2 to *identify those alternatives 6 that remain available for further selection*, available alternatives 7 . . . ." Ex. 2 at 8:11–:16. |

g.   **"grouping"**

| Defendants' Proposed Construction | Exemplary Evidence |
|---|---|
| "a combination of one of the features and a plurality of respective alternatives" | "Each *grouping* 13 comprises one of the features 5 and a plurality of respective alternatives 6 . . . ." Ex. 2 at 7:13–:14. |

h.   **"features visually related to respective alternatives"**

| Defendants' Proposed Construction | Exemplary Evidence |
|---|---|
| "features shown together with alternatives on the display device of the user's computer" | "The feature screen 9, as shown in FIGS. 7 through 9, provides a display of a series of groupings 13 . . . . The grouping 13 *visually relates* the feature 5 to its respective alternatives 6 . . . ." Ex. 2 at 7:11–:19. |

## VI.   **CONCLUSION**

For all of these reasons, the terms should be construed, and summary judgment should be GRANTED, as set forth in the Proposed Order.

1

2   Dated:  September 15, 2011                    By:  /s/ Richard A. Cederoth

3                                                       David T. Pritikin (*pro hac vice*)
                                                            <dpritikin@sidley.com>
4                                                      Richard A. Cederoth (*pro hac vice*)
                                                            <rcederoth@sidley.com>
5                                                      SIDLEY AUSTIN LLP
                                                       One S. Dearborn Street
6                                                      Chicago, Illinois  60603
                                                       Telephone:   (312) 853-7000
7                                                      Facsimile:    (312) 853-7036

8                                                      Theodore W. Chandler (Bar No. 219456)
                                                            <tchandler@sidley.com>
9                                                      Aaron M. Farber (Bar No. 270851)
                                                            <afarber@sidley.com>
10                                                     SIDLEY AUSTIN LLP
                                                       555 West Fifth Street, Suite 4000
11                                                     Los Angeles, California  90013
                                                       Telephone:   (213) 896-6000
12                                                     Facsimile:    (213) 896-6600

13                                                     <Kelora-Microsoft-eBay@sidley.com>

14                                                     *Counsel for Plaintiff and Counterclaim-*
                                                       *Defendant eBay Inc.*
15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
Nos. 10-4947-CW, 11-1398-CW, 11-1548-CW, 11-2284-CW

1

By:  /s/ Richard A. Cederoth

2

David T. Pritikin (*pro hac vice*)
<dpritikin@sidley.com>

3

Richard A. Cederoth (*pro hac vice*)
<rcederoth@sidley.com>

4

SIDLEY AUSTIN LLP
One S. Dearborn Street

5

Chicago, Illinois  60603
Telephone:    (312) 853-7000

6

Facsimile:    (312) 853-7036

7

Theodore W. Chandler (Bar No. 219456)
<tchandler@sidley.com>

8

Aaron M. Farber (Bar No. 270851)
<afarber@sidley.com>

9

SIDLEY AUSTIN LLP
555 West Fifth Street, Suite 4000

10

Los Angeles, California  90013
Telephone:    (213) 896-6000

11

Facsimile:    (213) 896-6600

12

<Kelora-Microsoft-eBay@sidley.com>

13

14

David E. Killough (Bar No. 110719)
<davkill@microsoft.com>

15

MICROSOFT CORPORATION
One Microsoft Way, 8/2076

16

Redmond, Washington  98052
Telephone:    (425) 703-8865

17

Facsimile:    (425) 869-1327

18

*Counsel for Plaintiff and Counterclaim-Defendant Microsoft Corporation*

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
Nos. 10-4947-CW, 11-1398-CW, 11-1548-CW, 11-2284-CW

1

By:  /s/ Wendy K. Akbar

2

Gregory P. Sitrick (*pro hac vice*)

3

    <gregory.sitrick@quarles.com>
Wendy K. Akbar (*pro hac vice*)

4

    <wendy.akbar@quarles.com>
QUARLES & BRADY LLP

5

One Renaissance Square

6

Two North Central Avenue
Phoenix, Arizona  85004

7

Telephone:    (602) 229-5200
Facsimile:    (602) 420-5198

8

Jeffrey L. Fillerup (Bar No. 120543)

9

    <jfillerup@luce.com>
LUCE, FORWARD, HAMILTON & SCRIPPS LLP

10

Rincon Center II

11

121 Spear Street, Suite 200
San Francisco, California  94105

12

Telephone:    (415) 356-4600
Facsimile:    (415) 356-3881

13

Callie A. Bjurstrom (Bar No. 137816)

14

    <cbjurstrom@luce.com>
LUCE, FORWARD, HAMILTON & SCRIPPS LLP

15

600 West Broadway, Suite 2600
San Diego, California  92101

16

Telephone:    (619) 699-2586
Facsimile:    (619) 645-5323

17

*Attorneys for Plaintiff and Counterclaim-
Defendant Cabela's Inc.*

18

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
Nos. 10-4947-CW, 11-1398-CW, 11-1548-CW, 11-2284-CW

1

By:  /s/ Richard S. Zembek

2

Dan D. Davison (*pro hac vice*)
  <<ddavison@fulbright.com>>

3

FULBRIGHT & JAWORSKI L.L.P.

4

2200 Ross Avenue, Suite 2800
Dallas, Texas  75201

5

Telephone:  (214) 855-8000
Facsimile:  (214) 855-8200

6

7

Richard S. Zembek (*pro hac vice*)
  <<rzembek@fulbright.com>>
Daniel S. Leventhal (*pro hac vice*)
  <<dleventhal@fulbright.com>>

8

FULBRIGHT & JAWORSKI L.L.P.

9

Fulbright Tower

10

1301 McKinney, Suite 5100
Houston, Texas  77010

11

Telephone:  (713) 651-5151
Facsimile:  (713) 651-5246

12

Gilbert A. Greene (*pro hac vice*)
  <<ggreene@fulbright.com>>

13

FULBRIGHT & JAWORSKI L.L.P.

14

600 Congress Avenue, Suite 2400
Austin, Texas  78701

15

Telephone:  (512) 474-5201
Facsimile:  (512) 536-4598

16

John A. O'Malley (Bar No. 101181)
  <<jomalley@fulbright.com>>

17

Aaron D. Gopen (Bar No. 268451)
  <<agopen@fulbright.com>>

18

FULBRIGHT & JAWORSKI L.L.P.

19

555 South Flower Street, 41st Floor

20

Los Angeles, California  90071
Telephone:  (213) 892-9200
Facsimile:  (213) 892-9494

21

22

*Attorneys for Defendants and*
*Counterclaim-Plaintiffs Target*

23

*Corporation; Amazon.com, Inc.; Office*
*Depot, Inc.; Costco Wholesale*

24

*Corporation; Hewlett-Packard Company;*
*Audible, Inc.; and Zappos.com, Inc.*

25

26

27

28

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
Nos. 10-4947-CW, 11-1398-CW, 11-1548-CW, 11-2284-CW

1                              By:  /s/ John S. Letchinger

John S. Letchinger (*pro hac vice*)
<letchinger@wildman.com>
Douglas S. Rupert (*pro hac vice*)
<rupert@wildman.com>
E. Tim Walker (*pro hac vice*)
<walker@wildman.com>
WILDMAN, HARROLD, ALLEN & DIXON LLP
225 West Wacker Drive, Suite 2800
Chicago, Illinois  60606
Telephone:    (312) 201-2000
Facsimile:    (312) 201-2555

Clinton J. McCord (Bar No. 204749)
<mccord@wildman.com>
WILDMAN, HARROLD, ALLEN & DIXON LLP
9665 Wilshire Boulevard, Suite 200
Beverly Hills, California  90212
Telephone:    (310) 860-8700
Facsimile:    (310) 860-3800

*Attorneys for Defendant and Counterclaim-Plaintiff OfficeMax Incorporated*

By:  /s/ Niall A. MacLeod

Niall A. MacLeod (*pro hac vice*)
<niall.macleod@btlaw.com>
Aaron A. Myers (*pro hac vice*)
<aaron.myers@btlaw.com>
BARNES & THORNBURG LLP
225 South Sixth Street, Suite 2800
Minneapolis, Minnesota 55402
Telephone:    (612) 333-2111
Facsimile:    (612) 333-6798

Stephen R. Mick (Bar No. 131569)
<smick@btlaw.com>
BARNES & THORNBURG LLP
2049 Century Park East
Los Angeles, California  90067
Telephone:    (310) 284-3880
Facsimile:    (310) 284-3894

*Attorneys for Defendant and Counterclaim-Plaintiff Rockler Companies, Inc.*

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
Nos. 10-4947-CW, 11-1398-CW, 11-1548-CW, 11-2284-CW

By:  /s/ Catherine E. Hart

Vaibhav P. Kadaba (*pro hac vice*)
   &lt;wkadaba@kilpatricktownsend.com&gt;
Catherine E. Hart (*pro hac vice*)
   &lt;chart@kilpatricktownsend.com&gt;
KILPATRICK TOWNSEND & STOCKTON LLP
1100 Peachtree Street, Suite 2800
Atlanta, Georgia  30309
Telephone:    (404) 815-6500
Facsimile:    (404) 815-6555

David B. Perry (State Bar No. 255925)
   &lt;dperry@kilpatricktownsend.com&gt;
KILPATRICK TOWNSEND & STOCKTON LLP
Two Embarcadero Center, Eighth Floor
San Francisco, California  94111
Telephone:    (415) 576-0200
Facsimile:    (415) 576-0300

*Attorneys for Defendant and Counterclaim-Plaintiff 1-800-Flowers.com, Inc.*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

By:  /s/ David S. Bloch
                                    

Kimball R. Anderson (*pro hac vice*)
    <kanderson@winston.com>
Marlon E. Lutfiyya (*pro hac vice*)
    <mlutfiyya@winston.com>
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, Illinois  60601
Telephone:    (312) 558-5600
Facsimile:    (312) 558-5700

Howard I. Shin (*pro hac vice*)
    <hshin@winston.com>
WINSTON & STRAWN LLP
200 Park Avenue
New York, New York  10166
Telephone:    (212) 294-6700
Facsimile:    (212) 294-4700

David S. Bloch (State Bar No. 184530)
    <dbloch@winston.com>
WINSTON & STRAWN LLP
101 California Street
San Francisco, California  94111
Telephone:    (415) 591-1000
Facsimile:    (415) 591-1400

*Attorneys for Defendant and Counterclaim-Plaintiff Dell, Inc.*

-67-

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
Nos. 10-4947-CW, 11-1398-CW, 11-1548-CW, 11-2284-CW

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

By:  /s/ Kent E. Baldauf, Jr.

Kent E. Baldauf, Jr. (*pro hac vice*)
&lt;kbaldaufjr@webblaw.com&gt;
Bryan P. Clark (*pro hac vice*)
&lt;bclark@webblaw.com&gt;
THE WEBB LAW FIRM
One Gateway Center
420 Ft. Duquesne Blvd., Suite 1200
Pittsburgh, Pennsylvania 15222
Telephone:   (412) 471-8815
Facsimile:    (412) 471-4094

Phillip F. Shinn (State Bar No. 112051)
&lt;pshinn@foxrothschild.com&gt;
FOX ROTHSCHILD LLP
235 Pine Street, Suite 1500
San Francisco, California  94104
Telephone:   (415) 364-5558
Facsimile:    (415) 391-4436

*Attorneys for Defendant and Counterclaim-
Plaintiff Newegg Inc.*

1

By:  /s/ Sarah E. Barrows
_____

2
3
4
5

Sarah E. Barrows (Bar No. 253278)
    <barrowss@gtlaw.com>
GREENBERG TRAURIG, LLP
153 Townsend Street, 8th Floor
San Francisco, California  94107
Telephone:    (415) 655-1300
Facsimile:     (415) 707-2010

6
7
8
9
10
11
12

Michael A. Nicodema (*pro hac vice*)
    <nicodemam@gtlaw.com>
David M. Joyal (*pro hac vice*)
    <joyald@gtlaw.com>
Barry J. Schindler (*pro hac vice*)
    <schindlerb@gtlaw.com>
Douglas R. Weider (*pro hac vice*)
    <weider@gtlaw>
GREENBERG TRAURIG, LLP
200 Park Avenue, P.O. Box 677
Florham Park, New Jersey  07932
Telephone:    (973) 360-7900
Facsimile:     (973) 301-8410

13
14
15
16
17

Mary-Olga Lovett (*pro hac vice*)
    <lovettm@gtlaw.com>
GREENBERG TRAURIG, LLP
1000 Louisiana Street, Suite 1700
Houston, Texas  77002
Telephone:    (713) 374-3500
Facsimile:     (713) 374-3505

18

*Attorneys for Defendant and Counterclaim-Plaintiff CircuitCity.com Inc.*

19
20

By:  /s/ Ted G. Dane
_____

21
22
23
24
25

Ted G. Dane (Bar No. 143195)
    <Ted.Dane@mto.com>
Andrew W. Song (Bar No. 236588)
    <Andrew.Song@mto.com>
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue, 35th Floor
Los Angeles, California  90071
Telephone:    (213) 683-9100
Facsimile:     (213) 687-3702

26
27

*Attorneys for Plaintiff and Counterclaim-Defendant Nebraska Furniture Mart, Inc.*

28

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
Nos. 10-4947-CW, 11-1398-CW, 11-1548-CW, 11-2284-CW

## **SIGNATURE ATTESTATION**

Pursuant to General Order No. 45(X)(B), I hereby certify that concurrence in the filing of this document has been obtained from each of the other signatories shown above.


_____/s/ Wendy K. Akbar_____

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
Nos. 10-4947-CW, 11-1398-CW, 11-1548-CW, 11-2284-CW

**EXHIBITS**

Ex. 1:   Chart showing the original and amended claim language, the proposed constructions by Defendants, and supporting evidence

Ex. 2:   The patent-in-suit:  U.S. Patent No. 6,275,821 (effectively filed Oct. 14, 1994), *available at* <http://patft1.uspto.gov/netacgi/nph-Parser?patentnumber=6275821>

Ex. 3:   The C1 Reexamination Certificate to the '821 patent-in-suit (issued Nov. 2, 2010), *available at* <http://portal.uspto.gov/external/portal/pair> by searching for Application No. 90/009,316 and then clicking on "Image File Wrapper"

Ex. 4:   Excerpts from the child to the patent-in-suit:  U.S. Patent No. 6,327,588, *available at* <http://patft1.uspto.gov/netacgi/nph-Parser?patentnumber=6327588>

Ex. 5:   Excerpts from the parent to the patent-in-suit:  U.S. Patent No. 5,983,219, *available at* <http://patft1.uspto.gov/netacgi/nph-Parser?patentnumber=5983219>

Ex. 6:   Excerpts from the grandparent to the patent-in-suit:  U.S. Patent No. 5,715,444, *available at* <http://patft1.uspto.gov/netacgi/nph-Parser?patentnumber=5715444>

**Prior-art patents**

Ex. 7:   U.S. Patent No. 4,843,538 to Lane (issued June 27, 1989), *available at* <http://patft1.uspto.gov/netacgi/nph-Parser?patentnumber=4843538>

Ex. 8:   U.S. Patent No. 4,905,094 to Pocock et al. (issued Feb. 27, 1990), *available at* <http://patft1.uspto.gov/netacgi/nph-Parser?patentnumber=4905094>

Ex. 9:   U.S. Patent No. 5,436,637 to Gayraud (filed Mar. 5, 1993), *available at* <http://patft1.uspto.gov/netacgi/nph-Parser?patentnumber=5436637>

Ex. 10:  U.S. Patent No. 5,544,360 to Lewak et al. (effectively filed Nov. 23, 1992), *available at* <http://patft1.uspto.gov/netacgi/nph-Parser?patentnumber=5544360>

**Inventor testimony**

Ex. 11:  Excerpts from the deposition of Sherif Danish, the first-named inventor of the '821 patent-in-suit (Jan. 20–21, 2009)

Ex. 12:  Exhibit 1015 to the deposition of Sherif Danish:  Interrogatory response by PartsRiver, verified by Danish, contending that the AMP Navigator was the first reduction to practice of original claims 1 and 2 of the '821 patent-in-suit (Mar. 17, 2008)

Ex. 13:  Exhibit 1028 to the deposition of Sherif Danish:  claim chart with the "feature screen" circled

Ex. 14:  Excerpts from the deposition of Kris Kimbrough, the second-named inventor of the '821 patent-in-suit (Jan. 22, 2009)

Ex. 15:  Interrogatory response by Kelora asserting that amended claims 1–4 and 9 were conceived "during or before the second quarter of 1994," but admitting there is no corroboration for these assertions (June 3, 2011)

-71-

**Dictionaries**

Ex. 16:   *Webster's Ninth New Collegiate Dictionary* (1991): "file"

Ex. 17:   *Microsoft Press Computer Dictionary* (2d ed. 1994): "data file"

Ex. 18:   *McGraw-Hill Dictionary of Scientific and Technical Terms* (5th ed. 1994): "store"

**Proposed claim constructions by PartsRiver and Kelora**

Ex. 19:   PartsRiver's arguments about "displaying" in opposition to Defendants' motion to transfer the action from the Eastern District of Texas to this Court (Dec. 6, 2007) [Case No. 09-811, ECF No. 45]

Ex. 20:   PartsRiver's oral argument about "displaying" in opposition to Defendants' motion to transfer (Apr. 10, 2008) [Case No. 09-811]

Ex. 21:   Joint Claim Construction and Prehearing Statement, with agreed-upon constructions highlighted in yellow, from *PartsRiver, Inc. v. Shopzilla, Inc.; Yahoo! Inc.; Pricegrabber.com, Inc.; eBay Inc.; and Microsoft Corporation* (Dec. 15, 2008) [Case No. 09-811, ECF No. 141]

Ex. 22:   Joint Claim Construction and Prehearing Statement in the present actions (Aug. 30, 2011)

**Summary judgment of invalidity under § 102(b) due to the on-sale bar in Case No. 09-811**

Ex. 23:   Defendants' motion for summary judgment of non-infringement and invalidity due to the on-sale bar (May 28, 2009) [Case No. 09-811, ECF No. 201]

Ex. 24:   Screenshots of the AMP Navigator, which PartsRiver and Danish contend was the first reduction to practice of claims 1–2 of the '821 patent-in-suit, from Exhibit E to Defendants' motion for summary judgment of non-infringement and invalidity due to the on-sale bar (May 28, 2009) [Case No. 09-811, ECF No. 201-3]

Ex. 25:   Transcript of hearing on Defendants' motion for summary judgment (July 16, 2009) [Case No. 09-811, ECF No. 250]

Ex. 26:   Summary judgment of invalidity by this Court finding claims 1 and 2 of the '821 patent invalid due to the on-sale bar (Aug. 21, 2009) [Case No. 09-811, ECF No. 234]

Ex. 27:   Judgment in favor of Defendants (Aug. 21, 2009) [Case No. 09-811, ECF No. 235]

**Procedural history of the present actions**

Ex. 28:   Timeline of events concerning litigation over the '821 patent-in-suit [Case No. 09-811, ECF No. 266-1]

Ex. 29:   Certificate of interested entities showing that Danish and Kimbrough have an interest in Kelora (Mar. 9, 2011) [Case No. 10-4947, ECF No. 36]

Ex. 30:   Transcript of the Initial Case Management Conference in Case No. 10-4947 and hearing on PartsRiver's motion to vacate the summary judgment of invalidity in Case No. 09-811 and motion to be dismissed from Case Nos. 10-4947, 10-5106, and 10-5108 (Mar. 17, 2011)

-72-

Ex. 31:    Order denying PartsRiver's motion to vacate (Apr. 21, 2011) [Case No. 09-811, ECF No. 278]

Ex. 32:    Order dismissing PartsRiver from Case Nos. 10-4947, 10-5106, and 10-5108 (Apr. 21, 2011) [Case No. 10-4947, ECF No. 61]

Ex. 33:    Scheduling order in Case No. 10-4947 involving eBay and Microsoft (Apr. 21, 2011) [Case No. 10-4947, ECF No. 60]

Ex. 34:    Transcript of the Initial Case Management Conference in Case Nos. 11-1398, 11-1548, and 11-2284 (May 31, 2011) [Case No. 11-1548, ECF No. 274]

Ex. 35:    Scheduling order in Case Nos. 11-1398, 11-1548, and 11-2284 adopting same schedule for claim construction and summary judgment as in Case No. 10-4947 involving eBay and Microsoft (June 13, 2011) [Case No. 11-1548, ECF No. 267]

### **Summary judgment of invalidity under § 305 due to impermissible broadening**

Ex. 36:    eBay and Microsoft's motion for summary judgment of invalidity under 35 U.S.C. § 305 and no liability before November 2, 2010 (Mar. 31, 2011) [Case No. 10-4947, ECF No. 41]

Ex. 37:    Kelora's opposition to eBay and Microsoft's motion for summary judgment (Apr. 14, 2011) [Case No. 10-4947, ECF No. 56]

Ex. 38:    eBay and Microsoft's reply in support of summary judgment (Apr. 21, 2011) [Case No. 10-4947, ECF No. 62]

Ex. 39:    Transcript of hearing on eBay and Microsoft's motion for summary judgment (May 5, 2011) [Case No. 10-4947, ECF No. 71]

Ex. 40:    Order granting summary judgment of no liability before November 2, 2010, and denying without prejudice summary judgment of invalidity under 35 U.S.C. § 305 (May 9, 2011)

### **Kelora's infringement contentions**

Ex. 41:    Kelora's infringement contentions against eBay and Microsoft in Case No. 10-4947 (May 12, 2011)

Ex. 42:    Kelora's infringement contentions against all other Defendants in Case Nos. 11-1398, 11-1548, and 11-2284 (June 9, 2011)